*NOT FOR PUBLICATION*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MONTANA

| | |
|---|---|
| In re:<br><br>SHOOT THE MOON, LLC,<br><br>　　　　　　Debtor. | Case No. 2:15-bk-60979-WLH |
| CAP CALL, LLC,<br><br>　　　　　Plaintiff and<br>　　　　　Counterclaim-defendant,<br><br>　　v.<br><br>JEREMIAH J. FOSTER,<br><br>　　　　　Defendant and<br>　　　　　Counterclaim-plaintiff. | Adv. Proc. No. 2:17-ap-00028-WLH<br><br>**MEMORANDUM DISPOSITION RESOLVING COMPETING MOTIONS FOR PARTIAL SUMMARY JUDGMENT** |

A lot of legal work involves categorizing. The classification of a given event can yield different results under a range of legal regimes – including, for example, tax, bankruptcy, commercial, and securities law – or determine whether those regimes apply at all. The specifics of any given taxonomic exercise will differ based on the factual and legal contexts, but a common (although by no means universal) maxim is that the task must be guided by the substance of the event rather than by labels or other formalism.

Among other issues raised here, Jeremiah J. Foster (the "Trustee")[1] and CapCall, LLC dispute whether certain financial transactions should be classified as loans or as true sales of receivables. Both sides appear confident in their positions and have accordingly cross-moved for partial summary judgment regarding this issue. For the reasons discussed below, the court concludes that neither party is entitled to summary judgment. As such, the court denies both motions.

---

[1] The U.S. trustee appointed Jeremiah J. Foster as the chapter 11 trustee in the main case. Foster then became the trustee of the STM Liquidating Trust pursuant to a confirmed chapter 11 plan.

MEMORANDUM DISPOSITION RE:
COMPETING MOTIONS FOR
PARTIAL SUMMARY JUDGMENT　　　　Page 1

## BACKGROUND & PROCEDURAL POSTURE

Various entities that were predecessors of the debtor[2] in the main bankruptcy case operated restaurants in Idaho, Montana, and Washington.[3] When these Shoot the Moon entities needed further financing, several engaged in transactions with merchant cash advance companies, including CapCall.[4] At least twelve transactions were consummated between Shoot the Moon entities and CapCall, the terms of which are set forth in written Merchant Agreements and associated documents (including confessions of judgment, personal guaranties by Shoot the Moon's principal, and UCC-1 financing statements).[5]

The economic core of these transactions was that CapCall provided the Shoot the Moon entities with immediate cash (and hence liquidity to operate their business) upon closing of each transaction. In exchange, CapCall received an agreed portion of future receivables generated through the Shoot the Moon entities' operation of the restaurants. The amounts promised to CapCall exceeded the amount of cash CapCall paid the Shoot the Moon entities, which created possible profit for CapCall and represented the cost to the Shoot the Moon entities of obtaining financing in this fashion. Before the Shoot the Moon bankruptcy filing, CapCall received payments as a result of these transactions but claims it did not receive all monies promised.[6]

Some funds that the Shoot the Moon entities received before the petition date but did not pay to CapCall are currently deposited in a restricted account.[7] Some of the amounts that the debtor received after the petition were apparently utilized during the bankruptcy case.[8]

CapCall's operative complaint seeks declaratory relief that CapCall owns the balance of the restricted account, judgment against the Trustee for converting the

---

[2]  Shortly before the debtor filed a chapter 11 petition, the various entities merged into the debtor. The details are not relevant for present purposes, but for a further discussion see generally *Foster v. IOU Cent., Inc. (In re Shoot the Moon, LLC)*, 2020 Bankr. LEXIS 1374 (Bankr. D. Mont. May 21, 2020).

[3]  *See* ECF No. 162 ¶ 22; ECF No. 171 ¶ 1.

[4]  *See* ECF No. 162 ¶ 23; ECF No. 171 ¶¶ 2-4.

[5]  *See* ECF No. 161 Annexes "A" – "M"; ECF No. 171 Exs. "B" – "M".

[6]  *See* ECF No. 162 ¶ 38; ECF No. 171 ¶¶ 35 & 38.

[7]  *See* ECF No. 162 ¶¶ 9-10 & 17-18; ECF No. 171 ¶¶ 39-42.

[8]  *See* ECF No. 162 ¶¶ 19-20; ECF No. 171 ¶ 40.

**MEMORANDUM DISPOSITION RE:**
**COMPETING MOTIONS FOR**
**PARTIAL SUMMARY JUDGMENT          Page 2**

postpetition receipts,[9] and other miscellaneous fees, costs, and interest components.

The Trustee's answer includes various counterclaims against CapCall, including seeking declaratory relief regarding the applicable state law governing the transactions at issue and that these transactions amounted to disguised loans, avoidance and recovery of allegedly voidable transfers, and remedies stemming from CapCall allegedly charging usurious interest rates.

The present dispute began with CapCall's motion requesting partial summary judgment regarding (i) choice-of-law issues, (ii) the classification of CapCall's transactions with the Shoot the Moon entities as sales or loans, and (iii) the Trustee's avoidance action counterclaims. The Trustee opposed CapCall's motion and cross-moved for partial summary judgment regarding the first two issues. After the completion of briefing, the court heard oral argument by counsel for each party. The matter is now ready for decision.

## DISCUSSION

### Jurisdiction & Power

The court has subject matter jurisdiction regarding this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) & 157(a) and Standing Order No. DLC-43 (D. Mont. Jan. 16, 2019). This court is a proper venue for this litigation as a result of the pendency of the underlying Shoot the Moon bankruptcy case in this district.[10] Previous orders entered in this adversary proceeding reflect the parties' agreement that this is a "core" proceeding and each side's express consent to a final adjudication by this bankruptcy court.[11] Accordingly, the court may properly exercise the judicial power necessary to finally decide this dispute.

### Standard for Partial Summary Judgment

Federal Rule of Civil Procedure 56, which applies here through Bankruptcy Rule 7056, allows a party to move for complete or partial summary judgment. This relief should be granted only "if the movant shows that there is no genuine

---

[9]   CapCall's amended complaint refers to this count as "Court 2 – Conversation" but the court presumes this is a typo. *See* ECF No. 12 at 3.

[10]   *See* 28 U.S.C. § 1409(a).

[11]   *See, e.g.*, ECF No. 26 ¶ 2; ECF No. 53 ¶ 4.

**MEMORANDUM DISPOSITION RE:**
**COMPETING MOTIONS FOR**
**PARTIAL SUMMARY JUDGMENT**          Page 3

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

"The determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial."[12]

A summary judgment analysis requires the court to consider the evidence offered by the parties at that stage of the case "in the light most favorable to the nonmoving party."[13] When, as here, the parties have filed cross-motions for summary judgment, courts will "evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences."[14]

Finally, summary judgment is generally disfavored in the context of disputes that are intensely factual.[15]

### Applicable Substantive Law

Absent a contrary rule in the Bankruptcy Code, the contours of claims and property rights in bankruptcy cases are sculpted by applicable nonbankruptcy law.[16] Neither the Bankruptcy Code nor any other federal statute prescribes how to

---

[12] *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018) (cleaned up).

[13] *See, e.g.*, *Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation v. California*, 973 F.3d 953, 961 (9th Cir. 2020).

[14] *See, e.g.*, *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

[15] *See, e.g.*, *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 932 (9th Cir. 2017); *Int'l Healthcare Mgmt. v. Haw. Coalition for Health*, 332 F.3d 600, 604 (9th Cir. 2003).

[16] *See, e.g.*, *Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407, 1411-12 (2017); *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec.*, 549 U.S. 443, 450-51 (2007); *Butner v. United States*, 440 U.S. 48, 55-57 (1979); *Official Comm. of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings Int'l, Inc.)*, 714 F.3d 1141, 1146-49 (9th Cir. 2013). This modern approach is in tension with older Supreme Court precedent, which reflects a tradition of allowing bankruptcy courts to determine transactional substance as a matter of generalized bankruptcy law. *See, e.g.*, *Pepper v. Litton*, 308 U.S. 295, 304-06 (1939) (Douglas, J.); *Sawyer v. Hoag*, 84 U.S. (17 Wall.) 610, 619-22 (1873). When the applicable state law adopts a searching, fact-specific, and holistic inquiry into the substance of the transaction, however, this often will be a distinction that makes little or no difference to the ultimate outcome. *See, e.g.*, *United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 613-15 (7th Cir. 2005).

MEMORANDUM DISPOSITION RE:
COMPETING MOTIONS FOR
PARTIAL SUMMARY JUDGMENT          Page 4

differentiate true sales from loans, which means that bankruptcy courts should use the applicable state law.[17]

### Differentiating True Sales from Loans

An entity needing liquidity can monetize its present or future accounts receivable in two primary ways: it can sell the receivables at a discount to a buyer[18] or it can use the receivables as collateral for a loan. These two methods differ in key respects (including because the seller transfers title to the receivables in a sale transaction whereas the borrower retains title in a loan transaction), but they are not dissimilar. Indeed, Article 9 of the Uniform Commercial Code treats both secured loans and "a sale of accounts, chattel paper, payment intangibles, or promissory notes" as secured transactions subject to that statute's detailed rules regarding perfection and priority,[19] which its commentary explains reflects how "[i]n many commercial financing transactions the distinction is blurred."[20] The UCC, however, never "delineates how a particular transaction is to be classified" and its commentary instead notes that this "issue is left to the courts."[21]

The courts have responded by formulating a holistic, multipart framework to examine the substance of a given transaction. A notable law review article cataloged factors that are often considered:

> (1)    whether the buyer has a right of recourse against the seller;

---

[17]    *See, e.g.*, *In re R&J Pizza Corp.*, 2014 Bankr. LEXIS 5461, at *5-6 (Bankr. E.D.N.Y. Oct. 14, 2014); *Paloian v. LaSalle Bank Nat'l Ass'n (In re Doctors Hosp. of Hyde Park, Inc.)*, 507 B.R. 558, 708 (Bankr. N.D. Ill. 2013); *In re Criimi Mae, Inc.*, 251 B.R. 796, 801 (Bankr. D. Md. 2000).

[18]    The most straightforward sale transaction occurs when party A sells receivables to party B. A "securitization" is a more complex form of sale transaction whereby the seller transfers the receivables to a special purpose entity, which entity then issues to third parties debt securities that are collateralized by the receivables in order to obtain capital that completes the purchase transaction. *See generally* Kenneth N. Klee & Brendt C. Butler, *Asset-Backed Securitization, Special Purpose Vehicles and Other Securitization Issues*, ALI-ABA Course of Study Materials SJ082 (June 2004). Securitizations are commonly used in the context of mortgage loans, student loans, and assorted other debt obligations.

[19]    *See* U.C.C. § 9-109(a)(3). There are some specific exceptions to this general rule. *See id.* § 9-109(d)(4)-(7). There are also some Article 9 provisions providing rules specifically for sold rights to payment. *See, e.g.*, *id.* §§ 9-309(3)-(4), 9-318.

[20]    *See id.* § 9-109 Official Comment 4.

[21]    *Id.  See also id.* § 9-318 Official Comment 2 (similarly noting that "[n]either this article nor the definition of 'security interest' in section 1-201 provides rules for distinguishing sales transactions from those that create a security interest securing an obligation").

**MEMORANDUM DISPOSITION RE:
COMPETING MOTIONS FOR
PARTIAL SUMMARY JUDGMENT          Page 5**

(2)     whether the seller continues to service the accounts and commingles receipts with its operating funds;

(3)     whether there was an independent investigation by the buyer of the account debtor;

(4)     whether the seller has a right to excess collections;

(5)     whether the seller retains an option to repurchase accounts;

(6)     whether the buyer can unilaterally alter the pricing terms;

(7)     whether the seller has the absolute power to alter or compromise the terms of the underlying asset; and

(8)     the language of the agreement and the conduct of the parties.[22]

As with many multi-factor legal tests, no individual factor or combination of factors is determinative in a given case.[23]  This legal inquiry is not a quantitative exercise subject to replication by a computer program, but instead is a comprehensive and contextual endeavor in which "[a]nalysis of the various factors and their impact on the nature of the parties' agreement is fact-intensive, and a determination must be made based on the totality of the circumstances."[24]  One consideration that transcends and unites the specific factors, however, is the nature of how the parties allocated *risk* – in sales, the risk of loss from the purchased assets typically passes to the buyer whereas in disguised loans, various methods may be used to allocate risk such that the putative seller remains exposed to the

---

[22]   *See* Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 AM. BANKR. L.J. 181, 186-94 (1991).  The Aicher and Fellerhoff article cites and collects various cases to support its inventory of the factors.  Various other courts have since relied on the article's articulation of the relevant legal principles.  *See, e.g., Dryden Advisory Grp., LLC v. Beneficial Mut. Sav. Bank (In re Dryden Advisory Grp., LLC)*, 534 B.R. 612, 620 (Bankr. M.D. Pa. 2015); *In re R&J Pizza Corp.*, 2014 Bankr. LEXIS 5461, at *7-8 (Bankr. E.D.N.Y. Oct. 14, 2014); *Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.)*, 371 B.R. 680, 686-87 (Bankr. S.D.N.Y. 2007).

[23]   *See, e.g., Official Comm. of Unsecured Creditors v. LG Funding, LLC (In re Cornerstone Tower Servs.)*, 2018 Bankr. LEXIS 3562, at *13 (Bankr. D. Neb. Nov. 9, 2018).

[24]   *In re Dryden Advisory Grp.*, 534 B.R. at 620.

**MEMORANDUM DISPOSITION RE:**
**COMPETING MOTIONS FOR**
**PARTIAL SUMMARY JUDGMENT**          Page 6

underlying receivables or has otherwise provided the putative buyer recourse to sources of recovery beyond the receivables.[25]

## CONCLUSIONS ON SUMMARY JUDGMENT[26]

After reviewing the materials filed by CapCall and the Trustee in the light most favorable to the respective nonmoving party, the court ultimately concludes that (i) it is inappropriate and unnecessary at this stage to determine any choice-of-law issue and (ii) there are genuine disputes of material of fact precluding summary judgment regarding the substantive issues presently before the court.

### *Choice of Law*

The parties disagree about which state's law governs; CapCall maintains that New York law should apply while the Trustee urges application of Montana law. This disagreement tees up a potential choice-of-law issue on which both sides have sought declaratory relief and cross-moved for summary judgment.  The court is constrained, however, by the principle that "[a] choice-of-law determination is necessary only when a difference in the law will result in a different outcome."[27] Indeed, courts should and do decline to resolve these issues "in the abstract" apart

---

[25]  *See, e.g.*, *S & H Packing & Sales Co. v. Tanimura Distrib*., 883 F.3d 797, 802 (9th Cir. 2018) (en banc) (holding, in the PACA trust context, that a "court should look to the substance of the transaction to determine whether the transaction is a true sale or a secured loan" and "[i]n doing so, the transfer of risk should be a primary factor to which a court looks"); *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir. 1995) (explaining that "[t]he root of all of these factors is the transfer of risk"); *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 545-46 (3d Cir. 1979) (discussing various aspects of how a transaction allocated risk and concluding "that on this record none of the risks present in a true sale is present here"); *In re Dryden Advisory Grp.*, 534 B.R. at 620 ("To classify a transaction accurately, several attributes must be examined, primarily the allocation of risk."); *In re Cornerstone Tower Servs.*, 2018 Bankr. LEXIS 3562, at *13 (emphasizing how, across the holistic analysis, "the allocation of risk is primary to the determination").

[26]  The discussion in this part provides the court's conclusions in a general sense regarding the parties' dueling motions.  Consistent with Federal Rule of Civil Procedure 52(a)(3), which applies here through Bankruptcy Rule 7052, the court makes no factual findings or legal conclusions at this stage of the litigation.

[27]  *Villarreal v. Arnold*, 2016 U.S. Dist. LEXIS 176103, at *5 (N.D. Ill. Dec. 20, 2016).  *See also, e.g.*, *Nguyen v. Barnes & Noble Inc*., 763 F.3d 1171, 1175 (9th Cir. 2014) (explaining that a choice-of-law inquiry is not necessary when both options "dictate the same outcome"); *In re Aircrash Disaster Near Roselawn*, 948 F. Supp. 747, 750 (N.D. Ill. 1996) ("A court need not conduct a choice of law determination unless there is an actual conflict in the substantive law such that the case could have a different outcome depending on which law is applied.").

MEMORANDUM DISPOSITION RE:
COMPETING MOTIONS FOR
PARTIAL SUMMARY JUDGMENT          Page 7

from underlying substantive claims.[28]  Such judicial restraint comports with the prohibition on federal courts issuing advisory opinions.[29]

The court perceives no material difference in particular states' laws regarding the substantive issues presently before the court (i.e., whether the transactions between CapCall and the Shoot the Moon entities were so plainly true sales or loans such that one side is entitled to summary judgment).  Nor do the parties –each citing case law from assorted jurisdictions – clearly frame any outcome-determinative difference.

Courts applying New York law look to the same sorts of factors, including those described in the Aicher and Fellerhoff article, as courts applying other states' law.[30]  Moreover, New York's courts have long approached this sort of problem by examining "the substance of the transaction between the parties" and identifying "the essential character of the transaction."[31]  In New York, a "transaction must be judged by its real character, rather than by the form and color which the parties have seen fit to give it."[32]  Montana, too, is a jurisdiction where "[t]he law looks to the substance rather than the form."[33]  New York and Montana likewise take similar approaches to determining whether contracts are ambiguous and utilizing extra-contractual evidence to establish the parties' intent.[34]

---

[28]  *See, e.g.*, *In re Bayer Phillips Colon Health Probiotic Sales Practices Litig.*, 2014 U.S. Dist. LEXIS 158233, at *25 (D.N.J. Nov. 6, 2014).

[29]  *See, e.g.*, *Hall v. Beals*, 396 U.S. 45, 48 (1969) (articulating general rule that courts should "avoid advisory opinions on abstract propositions of law"); *Gerhart v. United States Dept. of Health and Human Servs.*, 242 F. Supp. 3d 806, 817 (S.D. Iowa 2017) (noting how "issuing a decision on the choice-of-law claim—detached from any underlying claims—would be tantamount to an advisory opinion"); *United Int'l Holdings v. Wharf (Holdings) Ltd.*, 946 F. Supp. 861, 866 (D. Colo. 1996) (declining to rule on choice-of-law issue when such a declaration "would be nothing more than an advisory opinion").

[30]  *See, e.g.*, *In re Dryden Advisory Grp.*, 534 B.R. at 620-26; *In re Cornerstone Tower Servs.*, 2018 Bankr. LEXIS 3562, at *12-22.

[31]  *See, e.g.*, *Hall v. Eagle Ins.*, 151 A.D. 815, 822-26 (N.Y. App. Div. 1912), *aff'd*, 211 N.Y. 507 (1914).

[32]  *Quackenbos v. Sayer*, 62 N.Y. 344, 346 (1875).  *See also, e.g.*, *Fast Trak Inv. Co. v. Sax*, 962 F.3d 455, 467 (9th Cir. 2020) (noting how the court is "bound by New York law to analyze the transaction and determine its 'real character'").

[33]  *Stanhope v. Shambow*, 54 Mont. 360, 363 (1918).  *See also, e.g.*, Mont. Code Ann. § 1-3-219 ("The law respects form less than substance."); *In re Charles M. Bair Family Trust*, 343 Mont. 138, 148 (2008) (discussing how Montana courts "emphasize substance over form" when interpreting legal instruments).

[34]  *Compare, e.g.*, *Ames v. Cty. of Monroe*, 162 A.D.3d 1724, 1725-26 (N.Y. App. Div. 2018), *with, e.g.*, *Wicklund v. Sundheim*, 383 Mont. 1, 6 (2016).

**MEMORANDUM DISPOSITION RE:**
**COMPETING MOTIONS FOR**
**PARTIAL SUMMARY JUDGMENT**          Page 8

Because the outcome here remains the same regardless of which state's law applies,[35] the court declines to make a general choice-of-law determination at this juncture in the litigation and, therefore, denies the cross-motions for partial summary judgment requesting such a determination.

### *Disposition of CapCall's Substantive Issues*

1.    True Sale v. Loan

As discussed, CapCall asks the court to declare that the financial transactions at issue here were sales rather than loans. Even without viewing the record in the Trustee's favor, however, there are several legitimate reasons why the transactions would be classified as loans.

First, the security interests reflected in the parties' documents are significantly broader than one would expect from a sale. For instance, a January 22, 2015 Merchant Agreement purports to secure the Shoot the Moon entity's "payment and performance obligations to" CapCall with "a security interest in all . . . payment and general intangibles (including but not limited to tax refunds, registered and unregistered patents, trademarks, service marks, copyrights, trade names, trade secrets, customer lists, licenses, [etc.]); goods; inventory; equipment and fixtures . . . and all proceeds of the foregoing."[36] Consistent with this broad granting clause, the UCC-1 financing statements CapCall filed describe the collateral as "[a]ll assets of the Debtor, now existing and hereafter arising, wherever located."[37]

To be sure, the filing of a financing statement alone is not conclusive evidence of a loan. Because Article 9 of the UCC applies to sales of accounts, it is not surprising that CapCall would file financing statements to perfect its interest in the putative purchased accounts – a buyer of accounts who fails to perfect its interest runs the risk of becoming subordinate to a subsequent buyer or other

---

[35]    The same conclusion may not follow in the context of other issues that may arise in this adversary proceeding. For example, if the court ultimately determines that the transactions at issue were loans, the Trustee asserts that those loans were usurious in violation of Montana law. CapCall may or may not have defenses to the Montana usury claim, but CapCall also argues that application of Montana law is unwarranted. If the ultimate outcome of the usury issue would differ based on the applicable state law, then the court will need to complete a choice-of-law analysis to finally adjudicate that dispute. At this point, however, it would be premature to perform that analysis in the abstract and when it is unclear whether fixing the applicable state law makes any difference.

[36]    ECF No. 161-1, Annex "A" at p. 2.

[37]    *See, e.g.*, ECF No. 180-3.

**MEMORANDUM DISPOSITION RE:**
**COMPETING MOTIONS FOR**
**PARTIAL SUMMARY JUDGMENT**          Page 9

secured party who is perfected.[38]  The court sees no reason, however, why a buyer of accounts should receive and potentially perfect security interests in assorted assets beyond what it purchases.

Thus, it would be unwarranted for CapCall as a buyer of accounts, rather than a secured lender, to perfect an interest in the Shoot the Moon restaurants' inventory, equipment, service marks, and other assets unrelated to the receivables conveyed.  To make this clearer through example, a buyer agreeing to purchase a house six months in the future might record an interest against the house in order to protect against intervening buyers or judgment creditors (or a bankruptcy trustee) but would not record any interest in other property not subject to the sale, such as the seller's car.  The fact that the documents at issue here include a broad security package for CapCall to generally collateralize the Shoot the Moon entities' payment obligations is indicative of a secured loan, not a sale.  This interpretation is further supported by CapCall's own characterization in all-asset UCC-1 financing statements describing each Shoot the Moon entity as a "debtor" rather than a "seller" or words of similar import.[39]

Second, the transactions include various loan-like features that give CapCall recourse against property other than the receivables.  For instance, a March 16, 2015 Merchant Agreement and related documents contain the following:

- A broad personal guaranty by Shoot the Moon's principal that "is an absolute, primary, and continuing guarantee of ***payment*** and performance" (emphasis added), "is a guarantee of payment and not merely a guaranty of collection," renders the guarantor "primarily liable, jointly and severally," with the Shoot the Moon entity, and includes various waivers such as of any requirement that CapCall "take any action . . . against any security or collateral" before demanding payment from the guarantor.[40]

- An affidavit of confession of judgment whereby both the Shoot the Moon entity and the personal guarantor confess to a generalized judgment in a fixed sum equal to the total amount to be paid to CapCall plus legal fees and "interest at the rate of 16% per annum."  The "judgment is for a debt

---

[38]   *See* U.C.C. § 9-318 Official Comment 3 (example describing contest between Buyer-1 and Buyer-2).

[39]   *See id.* § 9-505(a).

[40]   ECF No. 161-1, Annex "C" at p. 2.

**MEMORANDUM DISPOSITION RE:**
**COMPETING MOTIONS FOR**
**PARTIAL SUMMARY JUDGMENT**          Page 10

due to [CapCall] arising from Defendants' failure to pay to [CapCall], [the Shoot the Moon entity's] accounts-receivable . . . and for Defendants' breach of the secured Merchant Agreement" more generally.[41]

- Various "Protections Against Default," including provisions generally accelerating "[t]he full uncollected Purchased Amount," allowing CapCall to "enforce its security interest in the Collateral identified herein" (recall that this "Collateral" is far broader than just the purchased accounts), permitting CapCall to generally enforce "its rights and remedies by lawsuit," authorizing CapCall to exercise rights under an assignment of lease of the Shoot the Moon entity's premises (it is unclear how this would work in practice, but in theory it allows CapCall to take over the Shoot the Moon restaurants), and enabling CapCall to generally debit any of the Shoot the Moon entity's deposit accounts.[42]

- A continuing requirement that the Shoot the Moon entity provide CapCall with financial statements within five business days of CapCall's request; "failure to do so is a material breach of this Agreement."[43]

Although none of these features is dispositive, their collective effect appears to provide CapCall with at least conditional recourse against the Shoot the Moon entities and the personal guarantor more generally. At a minimum, these provisions all reflect an allocation of risk whereby CapCall is protected by significantly more than just the value of the receivables it purportedly bought while the Shoot the Moon entity remains exposed. Such an overall arrangement is consistent with a debtor-creditor relationship, not a seller-buyer relationship.

Third, the parties' course of performance reflects a debtor-creditor relationship. The Trustee provided copies of emails in which the business principals describe the relationship as one involving "loans" with "terms."[44] Even

---

[41] *Id.* at pp. 37-38 of 200 per the ECF pagination.

[42] *Id.* ¶ 1.11 at pp. 3-4. The agreements are not uniform in terms of the ramifications of a Shoot the Moon bankruptcy filing. Some simply provide that a bankruptcy filing will trigger the "protections" related to the confessions of judgment and personal guaranties. Others treat a bankruptcy filing as a broader event of default that could perhaps support broader remedies (or "claims" in the bankruptcy case). These Merchant Agreements are not models of precision or legal drafting.

[43] *Id.* ¶ 2.1 at p. 4.

[44] *See, e.g.*, ECF Nos. 171-15, 180-1.

**MEMORANDUM DISPOSITION RE:**
**COMPETING MOTIONS FOR**
**PARTIAL SUMMARY JUDGMENT**          Page 11

more problematic for CapCall are materials provided by the Trustee that appear to demonstrate that the payments made to CapCall were funded through a deposit account owned by a Shoot the Moon entity that had no relationship with CapCall, that this deposit account commingled receivables CapCall purportedly bought with other funds, and that CapCall business people were aware of (and perhaps encouraged) this structure for processing the payments.[45]  The evidence of the parties' course of dealing and understanding of the true substance of their relationship could be more fully developed at trial, but certainly the Trustee has provided evidence of conduct deeply inconsistent with true sales of receivables.

Absent compelling evidence to the contrary, this record supports a determination that the transactions between the Shoot the Moon entities and CapCall are loans.  Factors (1), (2), and (8) from the Aicher and Fellerhoff article support a loan characterization.[46]  Moreover, the overall economic substance and risk allocation of these transactions appear substantially similar to a loan.  The multifaceted support for the Trustee's position in the current record means that CapCall is not entitled to summary judgment regarding this issue.

## 2. Trustee's Avoidance Actions

Finally, CapCall is not entitled to summary judgment regarding the Trustee's avoidance action claims.  CapCall's request is based on its assertion that the Trustee has not identified the transfers at issue. Yet the Trustee has provided a declaration and spreadsheet detailing numerous transfers totaling more than $1.1 million made to or for the benefit of CapCall within the 90 days before the Shoot the Moon bankruptcy filing.[47]  Moreover, there is no dispute that CapCall actually received some restaurant receipts generated by the Shoot the Moon entities pursuant to the parties' Merchant Agreements – i.e., that property was in fact transferred to CapCall before the bankruptcy.  Although it remains to be seen whether CapCall merely received a conveyance of property it previously purchased (pursuant to a true sale) or was the transferee of property in which the Shoot the Moon entities otherwise had an interest (pursuant to a secured loan), the Trustee has presented evidence of transfers that suffices to establish genuine issues of material fact regarding the Trustee's avoidance action claims.  As such, CapCall's

---

[45]   *See, e.g.*, ECF No. 180-1.

[46]   Some of the factors are unlikely to tilt in either direction or be relevant in this context.  For example, since CapCall was purportedly buying "future" receivables (i.e., payments made by restaurant customers after the transactions closed), there were no account debtors who could be investigated by CapCall.

[47]   ECF No. 171-14.

**MEMORANDUM DISPOSITION RE:**
**COMPETING MOTIONS FOR**
**PARTIAL SUMMARY JUDGMENT**         Page 12

request for summary judgment regarding these counts of the Trustee's counterclaims must be denied.

### *Disposition of the Trustee's Substantive Issues*

In contrast to CapCall, the Trustee asks the court to summarily determine that the transactions at issue constitute loans. As described above, there is significant evidence supporting the Trustee's position. Nevertheless, at least when viewed in the light most favorable to CapCall, the record contains some evidence that could support a determination that the transactions were true sales.

First, the terms of the Merchant Agreements include lengthy provisions regarding how the central transaction "is not intended to be, nor shall it be construed as a loan" but instead is a purchase of receipts for an amount that "equals the fair market value of such [r]eceipts."[48] Although "[s]imply calling transactions 'sales' does not make them so" because "[l]abels cannot change the true nature of the underlying transactions,"[49] these contractual provisions are not irrelevant and provide some evidence that could support a finding that the transactions were true sales.

Second, CapCall's position finds some support in case law in which courts found broadly similar agreements to be sales transactions based on the agreements' inclusion of reconciliation provisions and absence of fixed terms.[50] Here, at least some of the agreements include reconciliation provisions and none of the

---

[48]   *See, e.g.*, ECF No. 161-1 ¶ 1.9 at p. 3.

[49]   *In re Woodson Co.*, 813 F.2d 266, 272 (9th Cir. 1987).

[50]   *See, e.g.*, *K9 Bytes, Inc. v. Arch Capital Funding, LLC*, 56 Misc. 3d 807, 817-18 (N.Y. Sup. Ct. 2017). The court finds unpersuasive CapCall's arguments and authorities regarding how transactions should be classified as sales when the buyer cannot "be assured of repayment, because its agreements are contingent on a merchant's success." *Id.* at 818. Many lenders are not "assured of repayment" if the borrower's business does not succeed. In countless chapter 11 and chapter 7 cases, unsecured and undersecured creditors have received cents on the dollar when a business they financed did not blossom. In the context of a restaurant business such as Shoot the Moon, most of the value of the enterprise and the debtor's ability to generate liquidity for debt service depends on successful future operations. When operations are impacted – because the restaurant is no longer serving food that people want to eat, is unable to open due to governmental restrictions such as those recently occasioned by the COVID-19 situation, is impacted by broader economic or cultural shifts, or is affected by any of the many other events that can cause a deterioration in performance – many or all of the restaurant's creditors will likely suffer losses, particularly since food inventory and fixtures rarely have substantial residual liquidation value. The analysis should not focus on whether the counterparty is "assured of repayment" or depends "on a merchant's success," but instead on whether the counterparty's right to recovery is limited to a specific *res* of purchased assets. When the counterparty has a ***legal right*** to be paid in full by the business, the existence of that legal right would be indicative of a debtor-creditor relationship even if ***practical realization of that legal right*** is "contingent on a merchant's success" and hence not assured.

**MEMORANDUM DISPOSITION RE:**
**COMPETING MOTIONS FOR**
**PARTIAL SUMMARY JUDGMENT**          Page 13

agreements specifies a fixed term.  Although the Trustee argues that the reconciliation provisions are illusory and were never actually utilized and that each of the transactions had an effective term which could be mathematically derived (as reflected in contemporaneous emails), these arguments require a full examination of the course of dealing between the parties and weighing of the evidence.  Put differently, viewed in the light most favorable to CapCall, there are genuine issues of material fact regarding whether the inclusion of reconciliation provisions and absence of fixed terms are sufficiently indicative of sale transactions.

Third, at least some of the Aicher and Fellerhoff factors appear to support CapCall's position, including the absence of any provisions allowing the Shoot the Moon entities to repurchase the receivables or permitting CapCall to alter the pricing terms.

In sum, when viewed in the light most favorable to CapCall, the evidence creates some possibility that the court could ultimately conclude that the transactions were true sales.  To be sure, the Trustee looks to have the better side of the dispute, but a final resolution either way requires the development of a complete record that the court can analyze through an impartial lens (rather than in the light most favorable to the nonmoving party as required at the summary judgment stage).  At day's end, distinguishing true sales from loans is a fact-intensive and holistic exercise ill suited for resolution under Rule 56.[51]

## SUMMATION

To wrap up, the court concludes that neither CapCall nor the Trustee is entitled to summary judgment on any issue.  At this stage, it is premature for the court to decide which state's law should apply.  Likewise, the court cannot decide whether these transactions constitute loans or true sales at the summary judgment stage.  Although the evidence supporting the Trustee's side of this issue is much more robust, the court ultimately cannot resolve such a highly factual question without development of a complete record at trial.  Finally, there are sufficient factual questions related to the Trustee's avoidance actions for those claims to survive a Rule 56 motion.  Because neither party is entitled to partial summary judgment, the court denies both motions.

---

[51] *See, e.g.*, *IT Grp., Inc. v. Anderson Equip. Co. (In re IT Grp., Inc.)*, 332 B.R. 673, 676 n.7 (Bankr. D. Del. 2005).

**MEMORANDUM DISPOSITION RE:**
**COMPETING MOTIONS FOR**
**PARTIAL SUMMARY JUDGMENT**          Page 14

DATED: November 6, 2020.

                                 _____

                                 WHITMAN L. HOLT

                                 U.S. BANKRUPTCY JUDGE

**MEMORANDUM DISPOSITION RE:**
**COMPETING MOTIONS FOR**
**PARTIAL SUMMARY JUDGMENT**        Page 15