*FOR PUBLICATION*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MONTANA

| | |
|---|---|
| In re: | Case No. 2:15-bk-60979-WLH |
| SHOOT THE MOON, LLC, | |
| Debtor. | |

| | |
|---|---|
| CAP CALL, LLC, | Adv. Proc. No. 2:17-ap-00028-WLH |
| Plaintiff and Counterclaim-defendant, | **MEMORANDUM OPINION** |
| v. | |
| JEREMIAH J. FOSTER, | |
| Defendant and Counterclaim-plaintiff. | |

Legal relationships between private parties are largely defined by contract. When these contracts are implicated in litigation, courts must assess the terms and other relevant evidence to classify and determine the parties' rights and liabilities, often months or years after the original deal. In some instances, this after-the-fact analysis reveals legally significant aspects of the contractual relationship that the parties might not have appreciated when contracting.

In this adversary proceeding, a bankruptcy trustee and CapCall, LLC disagree about the legal classification and ramifications of prepetition transactions. After fully considering the evidence presented at trial, as well as briefing and oral argument offered by both sides, the court has determined that the trustee is entitled to entry of a judgment against CapCall. The details follow below.[1]

---

[1] This opinion sets forth the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52(a). If any findings of fact are more properly construed as conclusions of law, or vice versa, they are adopted and should be construed as such.

## FACTUAL BACKGROUND & PROCEDURAL POSTURE

### *The Shoot the Moon Enterprise Generally*

In the early 2000s, Kenneth Hatzenbeller and two other principal investors created a business generally known as Shoot the Moon.  Over time this enterprise grew to consist of nineteen LLCs formed pursuant to Idaho, Montana, and Washington law that owned and operated sixteen restaurants located throughout the three states.[2]  Among other forms of customer payment, the restaurants accepted credit cards, which generated a revenue stream for the Shoot the Moon entities through a processing company called Heartland Payment Systems, Inc.[3]  Until shortly before the underlying Shoot the Moon bankruptcy case discussed later, Mr. Hatzenbeller exercised day-to-day management and control of all Shoot the Moon entities from his office in Great Falls, Montana.

The Shoot the Moon restaurants eventually encountered various financial pressures, including due to the 2007-2009 Great Recession and improvements demanded by some of the restaurants' franchisors.  Hoping to combat these pressures, Mr. Hatzenbeller sought additional financing from various sources.  Initial sources included himself and the original investors, family and friends, additional third-party investors, traditional bank lenders, and trade creditors.  Some creditors obtained and perfected security interests regarding all assets of various of the entities (including accounts receivable) via UCC-1 financing statements that predate the CapCall transactions.[4]

### *Prepetition Merchant Cash Transactions With CapCall, LLC*

Once the Shoot the Moon entities exhausted the sources of capital mentioned above, several sought additional financing from merchant cash advance companies such as CapCall.  Between October 2014 and September 2015, the Shoot the Moon entities and CapCall consummated eighteen transactions.  The parties detailed the terms in written Merchant Agreements and associated documents (including confessions of judgment, personal guaranties by Shoot the Moon's principals, and

---

[2]   *See* Final Pretrial Order ¶¶ IV.1, 3-5, ECF No. 260.

[3]   *See, e.g.*, Trial Exs. 30-77.

[4]   *See, e.g.*, Trial Exs. 147 (Prairie Mountain Bank filings with the Idaho and Montana Secretaries of State), 148 (American Express Bank filings with the Montana Secretary of State), 149 (US Foods filing with the Montana Secretary of State).

**MEMORANDUM OPINION**          Page 2

UCC-1 financing statements).[5]  The Merchant Agreements are generally similar but contain minor variations.

The economic core of these transactions was that CapCall provided the Shoot the Moon entities with immediate cash (and hence liquidity to operate) upon closing.  In exchange, CapCall received a portion of future receivables generated through the restaurant operations.  The amounts promised to CapCall substantially exceeded the amount of cash CapCall paid, which created possible profit for CapCall and represented the cost to the Shoot the Moon entities of obtaining financing in this fashion.

Return transfers to CapCall were effected via fixed daily ACH debits (in the "Specified Daily Amount" per each agreement) against bank accounts Mr. Hatzenbeller specified.  The debits continued regarding a given agreement until CapCall received a total "Receipts Purchased Amount" set forth in that agreement. A significant majority of the transfers were made using the bank account of an entity – Shoot the Moon Grizzly, LLC – that was not party to any of the agreements and did not operate any restaurants generating receivables.[6]  Jason Leak, the primary representative of CapCall, knew about this mismatch between the contractual counterparty entities and the entity used to fund payments.  Mr. Leak expressed no concern other than to request that there was "an account that will clear all the time."[7]

Mr. Hatzenbeller and Mr. Leak arranged each transaction via email.[8]  In these emails, the two primarily addressed the amount CapCall would advance to a particular Shoot the Moon entity.  Before funding, Mr. Leak emailed Mr. Hatzenbeller legal documents for signature – CapCall apparently never countersigned any of the agreements.  CapCall and each specific entity

---

[5]    *See* Final Pretrial Order ¶ IV.6, ECF No. 260; Trial Exs. 19 (the date of the agreement listed as item no. 6 was orally corrected at trial as 4/6/15), 101-118, 204-211.

[6]    *See, e.g.*, Trial Ex. 144.

[7]    Trial Ex. 138. *See also, e.g.*, Trial Exs. 130, 133; Leak Dep. 38:14-41:9, ECF No. 268-1; Leak 30(b)(6) Dep. 38:2-39:19, ECF No. 268-2.

[8]    In his emails, Mr. Leak's signature block represented that he was a "Sr. Underwriting Manager" of CapCall, however, he worked as an independent contractor for CapCall rather than as an employee. *See, e.g.*, Trial Ex. 127.  In letters printed on CapCall letterhead, Mr. Leak also called himself a "Managing Director" of CapCall. *See* Trial Exs. 140-141.  Aspects of the email arrangements Mr. Leak used seem highly unusual.  For example, on March 10, 2015, Mr. Hatzenbeller wrote Mr. Leak at his usual email address, but appears to have received a response from a "Josh Altman" from a different email address, followed five minutes later by a textually-identical response from Mr. Leak. *See* Trial Ex. 127.  No explanation was provided at trial regarding who Mr. Altman is or why he was responding to emails sent to Mr. Leak.

**MEMORANDUM OPINION**              Page 3

documented each transaction via a separate, standalone Merchant Agreement. CapCall selected the terms and conditions of these agreements by using its form documents; Mr. Hatzenbeller testified that the two negotiated no specific terms beyond the basic economics and that he in fact did not read the documents before signing them. Although Mr. Leak occasionally suggested to Mr. Hatzenbeller that he could obtain regular financing, there was no binding commitment to lend or make future advances and each new transaction was subject to separate investor approval and documentation.[9] Emails between Mr. Hatzenbeller and Mr. Leak often referred to the transactions as "loans" or "notes" and on at least one occasion, there was specific negotiation regarding the temporal "term" of a transaction.[10]

### The Shoot the Moon Bankruptcy Generally

On October 20, 2015, all nineteen Shoot the Moon entities merged into Shoot the Moon, LLC.[11] The following day, this entity filed the underlying chapter 11 bankruptcy petition here.[12]

During the bankruptcy case, Jeremiah J. Foster (the "Trustee") was appointed as the chapter 11 trustee and then as trustee of the STM Liquidating Trust pursuant to the confirmed chapter 11 plan.[13]

For purposes of this dispute, material events during the course of the bankruptcy case include:

- The Trustee sold substantially all of the bankruptcy estate's business assets via Bankruptcy Code section 363(b). The net proceeds realized from this sale were substantially less than the amount of the claims of numerous secured creditors (including those with perfected security interests senior to CapCall), leaving them with significant unsecured deficiency claims under Bankruptcy Code section 506(a).[14] CapCall did not object to the sale or to a stipulation regarding distribution of the proceeds to certain of the senior secured creditors.

---

[9] *See, e.g.*, Trial Exs. 133, 136.

[10] *See* Trial Exs. 127-129, 136, 139.

[11] *See* Final Pretrial Order ¶ IV.8, ECF No. 260; Trial Exs. 180-192.

[12] *See* Final Pretrial Order ¶ IV.9, ECF No. 260.

[13] *See, e.g.*, Trial Ex. 155.

[14] *See* Trial Ex. 152 (column for claims that were "Secured Converted to Unsecured after Sale Closure").

**MEMORANDUM OPINION**                    Page 4

- The Trustee moved to obtain turnover of certain funds held by Heartland consisting of restaurant customer credit card payments processed prepetition but not transferred to any Shoot the Moon accounts before the petition date.[15]  The Trustee and CapCall subsequently stipulated to segregate these funds pending resolution of the parties' disputes. The balance is $228,449.93.[16]

- CapCall filed a proof of claim asserting a claim for conversion of receivables that CapCall contended it owned.  CapCall acknowledged that the claim was unsecured and that CapCall held no security interest in property of the debtor.[17]

### Posture of This Adversary Proceeding

In August 2017, CapCall commenced this adversary proceeding.  CapCall seeks declaratory relief that it owns the remaining balance deposited in the segregated account, a judgment against the Trustee for converting postpetition receipts, and other miscellaneous fees, costs, and interest components.  The Trustee counterclaimed seeking declaratory relief about which state's law applies to the transactions and that the transactions are disguised loans rather than sales.  The Trustee also seeks unencumbered title to the segregated account, avoidance and recovery of allegedly preferential transfers, and remedies stemming from CapCall's alleged usurious interest rates.

The court conducted a trial commencing June 29, 2021, and concluding the following day.  At trial, the court admitted numerous exhibits and deposition excerpts.[18]  The parties presented the following testimony:

- **Evan Marmott**.  Mr. Marmott is the CEO and owner of CapCall.  He testified about the general nature of CapCall's business and his understanding of how the Merchant Agreements operate, including features of the documents that he believes are standard industry practice.  Mr. Marmott testified about the due diligence CapCall did before entering into transactions, including reviewing account statements from the credit-card

---

[15]   *See* Final Pretrial Order ¶ IV.10, ECF No. 260.

[16]   *See id.* ¶¶ IV.11-12; Trial Exs. 161-162.

[17]   *See* Final Pretrial Order ¶ IV.13, ECF No. 260; Trial Ex. 142.

[18]   *See* ECF Nos. 268, 271, 272.

**MEMORANDUM OPINION**                    Page 5

payment processer and checking Mr. Hatzenbeller's credit report. Mr. Marmott conceded on cross-examination that he had no direct personal contact with Mr. Hatzenbeller and that such interactions occurred with CapCall's "outside brokers" such as Mr. Leak. Aside from this basic background information, the court did not find Mr. Marmott credible or persuasive. He was often evasive, his description of the relationship between CapCall and the Shoot the Moon entities was largely conclusory and self-serving (and hearsay due to his lack of interaction with Mr. Hatzenbeller), and his description of the Merchant Agreements frequently conflicted with the plain terms of the documents. For example, Mr. Marmott adamantly disclaimed the expansive scope of the collateral package granted to CapCall in the documents despite being shown the specific and unambiguous language.

- **Jeremiah Foster**. The Trustee testified about his experience as a turnaround professional and his involvement with the Shoot the Moon entities. Mr. Foster explained that Western Alliance Bank brought him into the situation, that he participated in a pre-bankruptcy meeting of creditors, and that he then became chapter 11 trustee. Mr. Foster detailed the section 363(b) sales process he coordinated, the resolution regarding distribution of the proceeds to various secured creditors (specifically noting the reasons CapCall was not invited to participate in the settlement process and that CapCall received notice but did not object to the final resolution), and the shift into a litigation mode. Overall, the court found Mr. Foster professional and credible. His testimony provided helpful context about events occurring during the bankruptcy case.

- **Nicole Manos**. Ms. Manos is a Senior Managing Director of Resolute, a financial services firm headed by Mr. Foster and retained to provide litigation support and financial advisory services to the Trustee. The Trustee offered Ms. Manos as an expert witness regarding the Shoot the Moon entities' financial condition and transactions. CapCall did not file a *Daubert* motion or otherwise challenge Ms. Manos' qualifications. Ms. Manos explained that she reviewed the assets and liabilities of the Shoot the Moon entities and concluded all relevant entities were insolvent both individually and collectively.[19] Ms. Manos further testified that she reviewed the entities' bank statements and prepared a schedule of transfers made to or for

---

[19]   *See* Trial Ex. 157.

**MEMORANDUM OPINION**                  Page 6

the benefit of CapCall within the 90 days prior to the petition date.[20]  Based on the premise that the transactions at issue constitute loans governed by Montana law, Ms. Manos also detailed her analysis used to compute the imputed interest rate of the loans and the applicable usury penalty.[21]  Ms. Manos also analyzed whether prepetition transfers to CapCall allowed it to receive more than if the Shoot the Moon entities liquidated in chapter 7.  Based on a valuation of the Shoot the Moon entities' assets and the existence of various creditors with undersecured liens, but still senior to CapCall, Ms. Manos' analysis revealed that: (i) CapCall received a greater recovery than possible in a hypothetical chapter 7 case absent the transfers and (ii) CapCall has no viable security interest in the receivables the Trustee allegedly converted or in the segregated funds.  Overall, the court found Ms. Manos clear and credible.  Ms. Manos' written materials and supporting testimony appear both comprehensive and easy to comprehend.

- **Kenneth Hatzenbeller (testimony via Zoom)**.  Mr. Hatzenbeller is one of the founders and former manager of Shoot the Moon.  He testified about the general history of the business and how he ended up dealing with merchant cash advance parties and CapCall specifically.  Mr. Hatzenbeller described his understanding of the CapCall transactions and discussed his interactions with Mr. Leak regarding new transactions.  Mr. Hatzenbeller explained how the transactions evolved into a series of "stacked" or "rolled" contracts whereby a portion of CapCall's later advances were used to pay off obligations from earlier agreements.[22]  Mr. Hatzenbeller outlined how he used the bank account of a defunct entity, Shoot the Moon Grizzly, LLC, as a central clearinghouse to fund payments for various other Shoot the Moon entities, including to CapCall.  Mr. Hatzenbeller detailed how the individual transactions with CapCall were not negotiated, but instead were "take-it-or-leave-it" deals offered using form documents Mr. Leak emailed; Mr. Hatzenbeller explained that he would look at the topline economic terms but otherwise did not read the contracts before signing.  Mr. Hatzenbeller acknowledged that he pled guilty for certain crimes relating to Shoot the Moon, but noted that he served his prison sentence and that the criminal activities were unrelated to anything involving CapCall.  On cross-examination, Mr. Hatzenbeller admitted that he made bad decisions as

---

[20]   *See* Trial Ex. 144; *see also* Trial Exs. 158-160 (compilations of the underlying bank statements).

[21]   *See* Trial Ex. 145.

[22]   *See also* Trial Ex. 129 (reflecting the arrangement of such a transaction).

**MEMORANDUM OPINION**            Page 7

manager of the Shoot the Moon entities and that he could have had legal counsel review the CapCall contracts but chose not to. Mr. Hatzenbeller further testified that funds received from CapCall were commingled and used to pay expenses across the entire Shoot the Moon enterprise, although he noted on redirect that he recorded movement of money across different entities via intercompany payables and receivables.[23] Overall, the court found Mr. Hatzenbeller sincere and genuinely contrite about events that occurred during his management of the Shoot the Moon entities, including regarding the CapCall transactions.

After trial, the court requested written submissions regarding several specified issues and heard closing argument. The matter is now ready for decision.

## LEGAL ANALYSIS

### Jurisdiction & Power

The court has subject matter jurisdiction regarding this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) & 157(a) and Standing Order No. DLC-43 (D. Mont. Jan. 16, 2019). This court is a proper venue for this litigation as a result of the pendency of the underlying Shoot the Moon bankruptcy case in this district.[24] Previous orders entered in this adversary proceeding reflect the parties' agreement that this is a "core" proceeding as well as each side's express consent to a final adjudication by this bankruptcy court.[25] Accordingly, the court may properly exercise the judicial power necessary to finally decide this dispute.[26]

### Constitutional & Other Standing Issues

In its post-trial submission, CapCall maintains that the Trustee lacks standing to pursue its declaratory relief claims.[27] The thrust of the argument is not clear, but CapCall appears to contend that the Trustee's claims are predicated on past, not recurring or "prospective," injuries and that the legal issues are not sufficiently related to a cause of action separately supporting federal jurisdiction.

---

[23]   *See also* Hatzenbeller Dep. 19:18-22:20, 34:14-23, ECF No. 271-1.

[24]   *See* 28 U.S.C. § 1409(a).

[25]   *See, e.g.*, Preliminary Pretrial Order ¶ 2, ECF No. 26; Stipulated Sch. Order ¶ 4, ECF No. 53, Final Pretrial Order ¶ II, ECF No. 260 (bilateral order recites that the adversary proceeding is core).

[26]   *See* 28 U.S.C. § 157(b)(1), (c)(2); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 674-81 (2015).

[27]   *See* Suppl. Post Trial Br. 8-12, ECF No. 275.

**MEMORANDUM OPINION**                    Page 8

Although CapCall's counsel declined to press the point during closing argument, because CapCall frames things as at least partially a matter of "constitutional standing" implicating this court's jurisdiction, the court is compelled to address this threshold consideration.[28]  For the reasons set forth below, the court concludes that the Trustee possesses the requisite standing.

To begin, this litigation involves an obvious case or controversary in which the Trustee has standing generally.  The Trustee's counterclaims (1) are based on an injury in fact that is concrete and particularized insofar as the Trustee, on behalf of the bankruptcy estate, seeks to recover for allegedly usurious payments made to CapCall and to avoid and recover allegedly preferential transfers made to or for the benefit of CapCall; (2) stem from an injury that is directly traceable to the challenged actions of CapCall insofar as CapCall is the transactional counterparty of the Shoot the Moon entities and transferee of the challenged transfers; and (3) are causes of action as to which it is highly likely that the injury will be redressed by a favorable decision insofar as the court can enter a monetary judgment against CapCall.  In short, this litigation involves particularized and non-theoretical claims against CapCall for losses that can be redressed by a decision for the Trustee, which provides Article III standing.[29]

More specifically, in the present context the Trustee may appropriately seek a judicial determination whether the transactions at issue were sales or loans – a question the Trustee frames as declaratory relief.[30]  Indeed, this is a predicate question requiring resolution en route to the court's determination of the Trustee's preference claims – claims arising under the Bankruptcy Code.  As discussed in detail later, without classifying the transactions as the Trustee requests, the court cannot determine whether payments made to CapCall on account of the transactions were preferences.  Notably, while CapCall now contends that the Trustee lacks standing to seek declaratory relief on this question, CapCall asks the court to resolve the very same issue.  In its own amended complaint, CapCall seeks

---

[28]   *See, e.g., Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-97 (1998).

[29]   *See, e.g., Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017).

[30]   CapCall's arguments regarding the Trustee's standing to pursue claims for declaratory relief are analytically odd.  The usual problem courts address regarding attacks on claims asserted under the Declaratory Relief Act occurs when those claims are pursued as standalone claims (often seeking what amounts to an advisory opinion) without an independent basis for federal jurisdiction.  *See, e.g., Shell Gulf of Mex. Inc. v. Ctr. for Biological Diversity, Inc.*, 771 F.3d 632, 635 (9th Cir. 2014).  Here, however, there is no dispute that the court has federal bankruptcy jurisdiction pursuant to 28 U.S.C. §§ 1334(b) & 157(a).  *See, e.g.*, Final Pretrial Order ¶ II, ECF No. 260.  Indeed, it was CapCall that commenced this adversary proceeding and first invoked this court's federal bankruptcy jurisdiction.  *See* Compl., ECF No. 1 ¶ 1.

**MEMORANDUM OPINION**                    Page 9

the same relief in order to address whether CapCall's purported purchase of the receivables entitles it to funds currently held in the segregated account and those the Trustee allegedly converted. CapCall fails to reconcile the discrepancy.

Further, like the classification issue, the court must determine whether Montana law applies to the transactions to resolve the Trustee's usury claim.

In sum, CapCall provides no basis (and the court sees none) to conclude that standing principles prevent the Trustee from pressing issues central to the outcome of this litigation, even if these issues are not technically cognizable as standalone causes of action under the Declaratory Judgment Act.[31] Thus, the court concludes that there is no "standing" issue here, constitutional or otherwise.[32]

### *Classification of the Transactions as True Sales or Loans*

As mentioned, the parties disagree about the legal classification of the transactions at issue: CapCall argues they are sales and the Trustee contends they are loans. If sales, CapCall acquired absolute ownership of the subject receivables. If loans, CapCall's advances entitled it to a security, rather than an ownership, interest in the receivables junior to several other interests. As also stated, the court must resolve this threshold question before addressing whether certain transfers to CapCall were preferences and whether CapCall violated Montana usury law. If CapCall's advanced funds purchased property, any subsequent transfer of that property to CapCall would not be a preference. Likewise, if there was no loan, CapCall could not have violated usury laws. The court now turns to this question.

I.      Applicable Substantive Law

Absent a contrary rule in the Bankruptcy Code, the contours of claims and property rights in bankruptcy cases are sculpted by applicable nonbankruptcy

---

[31]   *See, e.g.*, *Seitz v. 6130 W., LLC (In re Joey's Steakhouse, LLC)*, 474 B.R. 167, 183-84 (Bankr. E.D. Pa. 2012) (concluding that request for declaratory relief was moot when the parties were "engaged in full-blown litigation" requiring adjudication of substantive issues that "will perforce determine the rights of each party").

[32]   To conclude otherwise would render strange results. Since state law largely dictates property rights in bankruptcy, a party's inability to press a dispute about an interest in property would render meaningless many statutory rights and powers conferred by the Bankruptcy Code. The rules of procedure recognize these rights and powers and specifically require "a proceeding to determine the validity, priority, or extent of a lien or other interest in property" to commence by adversary complaint. Fed. R. Bankr. P. 7001(2).

**MEMORANDUM OPINION**                    Page 10

law.[33]  Neither the Bankruptcy Code nor any other federal statute prescribes how to differentiate true sales from loans, which means bankruptcy courts must turn to state law.[34]

Of course, the parties disagree about which state's law the court should apply to classify the transactions; CapCall maintains that New York law applies while the Trustee urges application of Montana law.  This appears to tee up a potential choice-of-law issue.  But the outcome of the true-sale-or-loan dispute remains the same regardless which state's law applies.  The court therefore is constrained by the principle that a "choice-of-law determination is necessary only when a difference in the law will result in a different outcome."[35]  Thus, the court need not make such a generalized determination at this step (though we will revisit the question later in connection with the usury claim).

## II.  Differentiating True Sales from Loans

An entity seeking liquidity may monetize its present or future accounts receivable in two primary ways: by either selling or borrowing against the receivables.[36]  While the monetization methods differ in obvious and key respects,

---

[33]  *See, e.g., Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407, 1411-12 (2017); *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec.*, 549 U.S. 443, 450-51 (2007); *Butner v. United States*, 440 U.S. 48, 55-57 (1979); *Official Comm. of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings Int'l, Inc.)*, 714 F.3d 1141, 1146-49 (9th Cir. 2013).  This modern approach is in tension with older Supreme Court precedent, which reflects a tradition of allowing bankruptcy courts to determine transactional substance as a matter of generalized bankruptcy law.  *See, e.g., Pepper v. Litton*, 308 U.S. 295, 304-06 (1939) (Douglas, J.); *Sawyer v. Hoag*, 84 U.S. (17 Wall.) 610, 619-22 (1873).  When the applicable state law adopts a searching, fact-specific, and holistic inquiry into the substance of the transaction, however, this often will be a distinction that makes little or no difference to the ultimate outcome.  *See, e.g., United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 613-15 (7th Cir. 2005).

[34]  *See, e.g., In re R&J Pizza Corp.*, 2014 Bankr. LEXIS 5461, at *5-6 (Bankr. E.D.N.Y. Oct. 14, 2014); *Paloian v. LaSalle Bank Nat'l Ass'n (In re Doctors Hosp. of Hyde Park, Inc.)*, 507 B.R. 558, 708 (Bankr. N.D. Ill. 2013); *In re Criimi Mae, Inc.*, 251 B.R. 796, 801 (Bankr. D. Md. 2000).

[35]  *Villarreal v. Arnold*, 2016 U.S. Dist. LEXIS 176103, at *5 (N.D. Ill. Dec. 20, 2016).  *See also, e.g., Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (explaining that a choice-of-law inquiry is not necessary when both options "dictate the same outcome"); *In re Aircrash Disaster Near Roselawn*, 948 F. Supp. 747, 750 (N.D. Ill. 1996) ("A court need not conduct a choice of law determination unless there is an actual conflict in the substantive law such that the case could have a different outcome depending on which law is applied.").

[36]  The most straightforward sale transaction occurs when party A sells receivables to party B.  A "securitization" is a more complex form of sale transaction whereby the seller transfers the receivables to a special purpose entity, which entity then issues to third parties debt securities collateralized by the receivables in exchange for capital that completes the purchase transaction.  *See generally* Kenneth N. Klee & Brendt C. Butler, *Asset-Backed Securitization, Special Purpose Vehicles and Other Securitization Issues*, ALI-ABA Course of Study Materials SJ082 (June 2004).  Securitizations are commonly used in the context of mortgage loans, student loans, and assorted other debt obligations.

they are not entirely dissimilar.  The shared aspects are reflected in the commentary to Article 9 of the Uniform Commercial Code where the drafters recognize that "[i]n many commercial financing transactions the distinction is blurred."[37]  In light of this, Article 9 treats both secured loans and "a sale of accounts, chattel paper, payment intangibles, or promissory notes" as secured transactions subject to that statute's detailed rules regarding perfection and priority.[38]  The statute stops short of "delineat[ing] how a particular transaction is to be classified" and, by design, the "issue is left to the courts."[39]

Courts have formulated a holistic, multipart framework to examine a transaction on the way to classifying it as a sale or a loan.  In a notable article, Robert D. Aicher and William J. Fellerhoff catalog factors courts often consider:

(1)    whether the buyer has a right of recourse against the seller;

(2)    whether the seller continues to service the accounts and commingles receipts with its operating funds;

(3)    whether there was an independent investigation by the buyer of the account debtor;

(4)    whether the seller has a right to excess collections;

(5)    whether the seller retains an option to repurchase accounts;

(6)    whether the buyer can unilaterally alter the pricing terms;

(7)    whether the seller has the absolute power to alter or compromise the terms of the underlying asset; and

(8)    the language of the agreement and the conduct of the parties.[40]

---

[37]    U.C.C. § 9-109 Official Comment 4.

[38]    *See id.* § 9-109(a)(3).  There are some specific exceptions to this general rule.  *See id.* § 9-109(d)(4)-(7).  There are also some Article 9 provisions providing rules specifically for sold rights to payment.  *See, e.g., id.* §§ 9-309(3)-(4); 9-318.

[39]    *Id.* § 9-109 Official Comment 4.  *See also id.* § 9-318 Official Comment 2 (similarly noting that "[n]either this article nor the definition of 'security interest' in section 1-201 provides rules for distinguishing sales transactions from those that create a security interest securing an obligation").

[40]    *See* Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 AM. BANKR. L.J. 181, 186-94 (1991).  The Aicher and

**MEMORANDUM OPINION**          Page 12

As with many multi-factor tests, no individual factor or combination thereof is determinative.[41]  The inquiry is not a quantitative exercise susceptible to replication by a computer program, but a comprehensive and heavily contextual endeavor.  A court's "[a]nalysis of the various factors and their impact on the nature of the parties' agreement is fact-intensive, and a determination must be made based on the totality of the circumstances."[42]  That said, a consideration that overlays and unites the factors is how the parties allocated *risk*.[43]  A sale typically occurs when the risk of loss from the purchased assets passes to the buyer – a gamble usually reflected in the purchase price.  Conversely, in a disguised loan, the parties may employ various methods to allocate risk – the putative seller typically remains exposed to the underlying receivables and may grant the putative buyer recourse to sources of recovery beyond the receivables.

To elaborate on a point touched earlier, the court perceives no material difference in particular states' laws regarding the distinction between sales and loans.  Nor do the parties clearly frame one (both have cited case law from assorted jurisdictions).  Courts applying New York law look to the same sorts of factors, including those described in the Aicher and Fellerhoff article, as courts applying other states' law.[44]  Moreover, New York courts have long approached this sort of problem by examining "the substance of the transaction between the parties" and identifying "the essential character of the transaction."[45]  In New York, a

---

Fellerhoff article cites and collects various cases to support its inventory of the relevant factors.  Other courts have since relied on this articulation of the relevant legal principles.  *See, e.g.*, *Dryden Advisory Grp., LLC v. Beneficial Mut. Sav. Bank (In re Dryden Advisory Grp., LLC)*, 534 B.R. 612, 620 (Bankr. M.D. Pa. 2015); *In re R&J Pizza Corp.*, 2014 Bankr. LEXIS 5461, at *7-8 (Bankr. E.D.N.Y. Oct. 14, 2014); *Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.)*, 371 B.R. 680, 686-87 (Bankr. S.D.N.Y. 2007).

[41] *Official Comm. of Unsecured Creditors v. LG Funding, LLC (In re Cornerstone Tower Servs.)*, 2018 Bankr. LEXIS 3562, at *13 (Bankr. D. Neb. Nov. 9, 2018).

[42] *In re Dryden Advisory Grp.*, 534 B.R. at 620.

[43] *See, e.g.*, *S & H Packing & Sales Co. v. Tanimura Distrib.*, 883 F.3d 797, 802 (9th Cir. 2018) (en banc) (holding, in the PACA trust context, that a "court should look to the substance of the transaction to determine whether the transaction is a true sale or a secured loan" and "[i]n doing so, the transfer of risk should be a primary factor to which a court looks"); *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1069 (2d Cir. 1995) (explaining that "[t]he root of all of these factors is the transfer of risk"); *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 545-46 (3d Cir. 1979) (discussing various aspects of how a transaction allocated risk and concluding "that on this record none of the risks present in a true sale is present here"); *In re Dryden Advisory Grp.*, 534 B.R. at 620 ("To classify a transaction accurately, several attributes must be examined, primarily the allocation of risk."); *In re Cornerstone Tower Servs.*, 2018 Bankr. LEXIS 3562, at *13 (emphasizing how, across the holistic analysis, "the allocation of risk is primary to the determination").

[44] *See, e.g.*, *In re Dryden Advisory Grp.*, 534 B.R. at 620-26; *In re Cornerstone Tower Servs.*, 2018 Bankr. LEXIS 3562, at *12-22.

[45] *See, e.g.*, *Hall v. Eagle Ins.*, 151 A.D. 815, 822-26 (N.Y. App. Div. 1912), *aff'd*, 211 N.Y. 507 (1914).

---

**MEMORANDUM OPINION**          Page 13

"transaction must be judged by its real character, rather than by the form and color which the parties have seen fit to give it."[46]  Montana, too, is a jurisdiction where "[t]he law looks to the substance rather than the form."[47]  Thus, the court will apply those factors from the Aicher and Fellerhoff article and look to the overall transactional substance rather than attempt to formulate a material discrepancy between New York and Montana law on the matter.

III.   Application of the Law to the Facts

Applying the standards discussed above to the totality of the record established at trial, the court determines that the transactions at issue are loans. The following findings and conclusions support this determination.

*First*, the security interests reflected in the transaction documents are significantly broader than those associated with a sale and much more akin to those associated with a loan.  For instance, a January 22, 2015 Merchant Agreement purports to secure the Shoot the Moon entity's "payment and performance obligations to" CapCall with "a security interest in all . . . payment and general intangibles (including but not limited to tax refunds, registered and unregistered patents, trademarks, service marks, copyrights, trade names, trade secrets, customer lists, licenses, [etc.]); goods; inventory; equipment and fixtures . . ., and all proceeds of the foregoing."[48]  While this represents only a single example, other agreements contain substantially similar language conferring security interests overly generous for a sale.  Consistent with these broad granting clauses, CapCall's UCC-1 financing statements usually describe the collateral as "[a]ll assets of the *Debtor*, now existing and hereafter arising, wherever located" (emphasis added).[49]

---

[46]   *Quackenbos v. Sayer*, 62 N.Y. 344, 346 (1875).  *See also, e.g.*, *Fast Trak Inv. Co. v. Sax*, 962 F.3d 455, 467 (9th Cir. 2020) (noting how the court is "bound by New York law to analyze the transaction and determine its 'real character'").

[47]   *Stanhope v. Shambow*, 54 Mont. 360, 363 (1918).  *See also, e.g.*, Mont. Code Ann. § 1-3-219 ("The law respects form less than substance."); *In re Charles M. Bair Family Trust*, 343 Mont. 138, 148 (2008) (discussing how Montana courts "emphasize substance over form" when interpreting legal instruments).

[48]   Trial Ex. 102 at p. 2.

[49]   *See* Trial Exs. 204, 206, 208-211.  One financing statement has a longer and more precise description of the collateral, but it too extends far beyond receivables by including, among other things, "general intangibles," "goods," "inventory equipment and fixtures," and "all computer programs."  *See* Trial Ex. 205.

**MEMORANDUM OPINION**          Page 14

The filing of a financing statement by itself is not indicative of a loan,[50] but the content of CapCall's statements is. Outside the context of a secured loan, there is no reason why CapCall should receive and perfect security interests in assorted assets other than the purchased receivables. Yet, as shown above, the typical Merchant Agreement and financing statement awarded CapCall a liberal security interest in the Shoot the Moon entity's assets. The restaurants' inventory, equipment, service marks, and other assets swept into the security agreements have little relation to the accounts that CapCall purportedly purchased.[51] The fact that the documents contemplate a broad security package for CapCall to generally collateralize payment obligations is indicative of a loan, not a sale.

To address CapCall's motive for filing UCC-1 financing statements, Mr. Marmott testified that merchant cash advance parties file UCC-1 financing statements as a matter of industry practice. This is undoubtedly true as far as it goes for the reasons already discussed. But Mr. Marmott's testimony did not rebut – nor did any other evidence – that collateral packages and financing statements of the exceptionally broad scope seen here are well beyond those associated with sales.[52] This evidence alone weighs powerfully in favor of classifying the transactions as loans. Mr. Marmott no doubt recognized this. At trial, he chose to outright deny CapCall's security interests in anything but the receivables despite being shown the broad scope of the granting clause explicit in the Merchant Agreements.

CapCall's financing statements contain another revealing indicator that they relate to secured loans: they identify each applicable Shoot the Moon entity as a

---

[50] Recall that Article 9 of the UCC applies to sales of accounts. So, it is not surprising that CapCall filed financing statements to perfect its interest in the putative purchased accounts – a buyer of accounts who fails to perfect its interest in that property by filing a financing statement runs the risk of becoming subordinate to a subsequent buyer or other secured party who is perfected. *See* U.C.C. § 9-318 Official Comment 3 (example describing contest between Buyer-1 and Buyer-2).

[51] To crystalize the point by analogy, someone agreeing to buy a house six months in the future may record an interest against the house in order to protect against intervening buyers or judgment creditors (or a bankruptcy trustee) but would not record any interest against the seller's car or personal property.

[52] Even assuming CapCall introduced evidence of an on-point "industry practice" or "commercial expectation," it is questionable its relevance to resolving the dispute before the court. The court's task is to apply the law to the facts before it; policy arguments related to industry practices, asserted market expectations, or the like are properly left to the legislative branch. *See, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 649 (2012); *W. Pac. Airlines v. GATX Capital (In re W. Pac. Airlines)*, 221 B.R. 1, 6 (D. Colo. 1998); *Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd. (In re Lehman Bros. Holdings Inc.)*, 422 B.R. 407, 422 n.9 (Bankr. S.D.N.Y. 2010). That said, if what occurred in this case actually is the industry's practice in the context of transactions intended to be true sales of receivables, it is misguided and warrants reconsideration, including in light of the Uniform Commercial Code sections and commentary cited above.

**MEMORANDUM OPINION**          Page 15

"debtor." This is telling because CapCall could have easily referred to each as a "seller" or words of similar import if CapCall deemed such designation more accurate.[53]

*Second*, the transaction documents give CapCall rights and recourse against property in addition to the overbroad collateral package. To provide a common example, a March 16, 2015 Merchant Agreement and related documents provide the following:

- A broad personal guaranty by Shoot the Moon's principal that "is an absolute, primary, and continuing guaranty of ***payment and performance***" (emphasis added), "is a guaranty of payment and not merely a guaranty of collection," renders the guarantor "primarily liable, jointly and severally," with the Shoot the Moon entity, and includes various waivers such as of any requirement that CapCall "take any action . . . against any security or collateral" before demanding payment from the guarantor.[54]

- An affidavit of confession of judgment whereby both the Shoot the Moon entity and the personal guarantor confess to a generalized judgment in a fixed sum equal to the total amount to be paid to CapCall plus legal fees and "interest at the rate of 16% per annum." The "judgment is for a debt due to [CapCall] arising from Defendants' failure to pay to [CapCall], [the Shoot the Moon entity's] accounts-receivable . . . and for Defendants' breach of the secured Merchant Agreement" more generally.[55]

- Various "Protections Against Default" and other extraordinary rights, including provisions creating a broad power of attorney for CapCall, generally accelerating "[t]he full uncollected Purchased Amount,"

---

[53]   *See* U.C.C. § 9-505(a).

[54]   Trial Ex. 105 at p. 2. Once again, the plain terms of the documents are inconsistent with Mr. Marmott's trial testimony. Mr. Marmott testified that all the guaranties were ***only*** of performance, not payment. The emphasized language quoted above says precisely the opposite. Indeed, more than half of the Merchant Agreements include language expressly creating an "absolute . . . guaranty of payment" (i.e., trial exhibits 101-108, 110, 113). The other Merchant Agreements are somewhat more limited in the scope of the guaranty, but that is a distinction without a difference insofar as the personal guaranty of "performance" of an "obligation" to pay money to CapCall is functionally a payment guaranty, as the affidavits of confession of judgment imposing accelerated liquidated sums due by the guarantors demonstrate.

[55]   Trial Ex. 105 at pp. bates stamped Cap Call - 000052 through 000054.

**MEMORANDUM OPINION**          Page 16

allowing CapCall to "enforce its security interest in the Collateral identified herein" (recall that this "Collateral" is far broader than just the putative purchased receivables), permitting CapCall to generally enforce "its rights and remedies by lawsuit," authorizing CapCall to exercise rights under an assignment of lease of the Shoot the Moon entity's premises (it is unclear how this would work in practice, but in theory it allows CapCall to take over the Shoot the Moon restaurants), and enabling CapCall to debit any of the Shoot the Moon entity's deposit accounts.[56]

- A continuing requirement that the Shoot the Moon entity provide CapCall with financial statements within five business days of CapCall's request; "failure to do so is a material breach of this Agreement."[57]

Although none of these features is dispositive alone, their collective effect weighs heavily in favor of characterizing the transactions as loans. As a whole, they provide CapCall with at least conditional recourse and expanded legal rights against the Shoot the Moon entities and the personal guarantors. Plus, they allocate great risk to the Shoot the Moon counterparty while protecting CapCall with much more than just the receivables. CapCall's panoply of rights, remedies, and potential control is highly unusual in the context of an asset sale. Such an overall arrangement is consistent with a debtor-creditor relationship, not a seller-buyer relationship.

This certainly did not escape Mr. Marmott. In familiar fashion, he tried to extinguish the extensive rights created for CapCall by simply denying that CapCall ever enforced them. These efforts are unavailing. As a foundational matter, Mr. Marmott's generous, and unilateral, waiver of CapCall's remedies is meaningless. Mr. Hatzenbeller testified that he was not made aware of any such waiver. What's more, the Merchant Agreements contain typical integration provisions stating that they embody the entire agreement.[58] So, Mr. Hatezenbeller could not rely on an undisclosed waiver much less one that conflicts with the agreements' terms. More significantly, it is immaterial whether CapCall exercised its rights. Many contracts

---

[56]   *See* Trial Ex. 105 at pp. 3-5 §§ 1.10, 1.11, 3.1, 3.2. The agreements are not uniform in terms of the ramifications of a Shoot the Moon bankruptcy filing. Some simply provide that a bankruptcy filing will trigger the "protections" related to the confessions of judgment and personal guaranties. Others treat a bankruptcy filing as a broader event of default that could perhaps support broader remedies (or "claims" in the bankruptcy case). These Merchant Agreements are not models of precision or legal drafting.

[57]   *See id.* at p. 4 § 2.1.

[58]   *See id.* at p. 5 § 4.8.

**MEMORANDUM OPINION**          Page 17

crafted in myriad contexts – such as credit agreements, bond indentures, M&A agreements, intercreditor agreements, commercial leases, insurance contracts, and bankruptcy plans – have detailed (if not mind-numbing) provisions specifying the contracting parties' rights, remedies, and options in various scenarios. Most will never come to pass; others may, but a party might elect not to enforce or to forgo some or all of its rights (either formally, as in a forbearance agreement, or informally, such as by simple inaction). Refraining from enforcement does not render forgone rights void ab initio or strip them from a contract. In fact, the Merchant Agreements explicitly preserved for CapCall any rights it declined to enforce.[59] CapCall drafted the agreements and, in doing so, extended itself significant protections. CapCall cannot now simply disclaim those features to reframe the transactions as sales.

 ***Third***, the parties' course of performance also reflects a debtor-creditor relationship. The evidence at trial demonstrated that:

- The business actors often discussed the transactions in vernacular reserved for debtor-creditor relationships, such as "loans" with "terms" and "balances." Contemporaneous emails between Mr. Leak and Mr. Hatzenbeller are replete with references to and discussions of the parties' "loans" and economic arrangements (such as balances and terms) consistent with loans.[60] And recall from an earlier discussion that CapCall's financing statements labelled the Shoot the Moon entities as "***debtors***." This jargon reflected the parties' subjective understanding of their transactions. Indeed, Mr. Hatzenbeller specifically testified that he conceptualized the transactions as "notes" akin to the promissory notes he signed when obtaining a traditional bank loan.

- Mr. Hatzenbeller funded many payments to CapCall through the deposit account of an entity having no operations or relationship to CapCall. The account commingled receivables CapCall purportedly bought with other funds, including those used to operate the restaurants. Mr. Leak, acting on CapCall's behalf, knew about the commingling, expressed no

---

[59] *See id.* at p. 5 § 4.4.

[60] *See* Trial Exs. 127 (email subject "Loan"), 128 (Hatzenbeller requesting list of "the notes I have with you and the amount left on them"), 129 (Hatzenbeller asking, "Which loan are we going to pay off?"; Leak responding with "the balance on that one"), 136 (email subject "Loans" and Hatzenbeller requesting summary of "all the loans I have with you and the amounts owing on each"; later messages about refinancing the "balance" owed on one of the "loans"), 139 (Hatzenbeller requesting a "statement for the out standing [sic] loans with you"; Hatzenbeller and Leak then negotiating for a "six month term").

**MEMORANDUM OPINION**   Page 18

objection, and encouraged Mr. Hatzenbeller to structure the flow of funds however he preferred.  Mr. Hatzenbeller testified that CapCall wanted only payment and communicated no interest in the source.

- The parties "stacked" or "rolled" funds from one transaction to the next. This practice committed a portion of the proceeds from a later transaction to satisfy the outstanding obligations of earlier transactions, effectively refinancing the earlier transactions.[61]  This makes sense only in the context of a loan.  Although theoretically possible, the transaction steps in the sale context would require the Shoot the Moon entities to rebuy future receivables previously sold to CapCall only to turn around and immediately resell the same receivables, and others, back to CapCall. Such circuitous behavior is nonsensical.

This evidence reveals a course of dealing deeply inconsistent with true sales of receivables.  CapCall presented no countervailing evidence to the contrary.  As such, the court concludes that the parties' actions show that they intended to transact via loans.

Specifically applying the Aicher and Fellerhoff factors to the discussion above, the court notes that three weigh heavily in favor of classifying the transactions as loans.[62]  First, as contemplated in the first factor, CapCall retained a definite right of recourse against the Shoot the Moon entities and several other parties.  Second, as the second factor contemplates, the Shoot the Moon entities

---

[61]   In its post-trial submission CapCall asserts that there is insufficient evidence these "rolling" transactions actually occurred.  *See* Suppl. Post Trial Br. 2-3, ECF No. 275.  The court disagrees.  First, as CapCall acknowledges, Mr. Hatzenbeller specifically testified that transactions with CapCall were rolled; this testimony was not rebutted by any other witness or challenged through cross-examination.  Second, Mr. Hatzenbeller's testimony is corroborated by contemporaneous emails in which he and Mr. Leak are negotiating a "rolling" or "stacking" transaction.  *See* Trial Ex. 129.  Third, the absence of lump-sum payments in the Trustee's accounting of prepetition transfers does not prove that no "rolling" transactions happened – there is no reason why CapCall would need to advance 100% of the new money to the Shoot the Moon entity only to have the Shoot the Moon entity immediately pay some portion back to CapCall in satisfaction of the preexisting Merchant Agreement.  Rather, as is typical in many debt refinancing transactions, CapCall could simply adjust the balances on its own books and transfer only the net amount of any new advance.  In fact, this appears to be exactly what happened with the transaction Mr. Hatzenbeller and Mr. Leak were arranging.  *See* Trial Exs. 109 at p.1 (new cash advance of nominal $175,000), 159 at p. bates stamped STM 004323 (July 2 credit to account of $136,541), 129 (Leak citing balance of preexisting agreement to be satisfied as $40,158 a couple days earlier, which would leave a net advance of approximately what was actually credited once the intervening days of ACH debits are subtracted from Leak's stated balance).  In sum, the weight of the evidence supports a factual finding that the transactions to which Mr. Hatzenbeller testified occurred.

[62]   Some of the factors do not tilt in either direction or are irrelevant.  For example, since CapCall purportedly bought "future" receivables (i.e., payments made by customers who ate at the restaurants after the transactions closed), there were no account debtors who could be investigated by CapCall.

**MEMORANDUM OPINION**          Page 19

commingled funds from the accounts receivable with other funds and specifically those used to operate the restaurants, with CapCall's approval to boot. Finally, as contemplated by the eighth factor, the language contained in the agreements and the conduct of the parties reveal an apparent debtor-creditor, rather than seller-buyer, relationship. Considered in conjunction with the overall economic substance and risk allocation that connects the factors, the court concludes that the transactions are substantially similar to a loan.

While so concluding, the court acknowledges that the evidence is not entirely one-sided. The Merchant Agreements include lengthy provisions regarding how the central transaction "is not intended to be, nor shall it be construed as a loan" but instead is a purchase of receipts for an amount that "equals the fair market value of such [r]eceipts."[63] But this *ipse dixit* is hardly convincing; "[s]imply calling transactions 'sales' does not make them so" because "[l]abels cannot change the true nature of the underlying transactions."[64] In this case, the countervailing evidence reveals that the term "sale" in the agreements is nothing more than a conclusory and self-serving label. Perhaps a little more favorable to CapCall is case law in which courts found somewhat similar agreements to be sale transactions based on the inclusion of reconciliation provisions and the absence of fixed terms.[65] Here, at least some agreements include reconciliation provisions and none specify a fixed term. These aspects, however, do not outweigh the overwhelming other loan-like aspects of the transactions or the parties' dealings (including the express negotiation of de facto "terms" for some transactions). Finally, a few of the Aicher and Fellerhoff factors support CapCall's position to

---

[63]   Trial Ex. 105 at p. 3 § 1.9.

[64]   *Fireman's Fund Ins. v. Grover (In re Woodson Co.)*, 813 F.2d 266, 272 (9th Cir. 1987).

[65]   *See, e.g.*, *K9 Bytes, Inc. v. Arch Capital Funding, LLC*, 56 Misc. 3d 807, 817-18 (N.Y. Sup. Ct. 2017). The court finds unpersuasive CapCall's arguments and authorities regarding how transactions should be classified as sales when the buyer cannot "be assured of repayment, because its agreements are contingent on a merchant's success." *Id.* at 818. Many lenders are not "assured of repayment" if the borrower's business does not succeed. In countless chapter 11 and chapter 7 cases, unsecured and undersecured creditors have received cents on the dollar when a business they financed failed to blossom. In the context of a restaurant business such as Shoot the Moon, most of the value of the enterprise and the debtor's ability to generate liquidity for debt service depends on successful future operations. When operations are impacted – because the restaurant is no longer serving food that people want to eat, is unable to open due to governmental restrictions such as those occasioned by the COVID-19 situation, is impacted by broader economic or cultural shifts, or is affected by any of the many other events that can cause a deterioration in performance – many or all of the restaurant's creditors will likely suffer losses, particularly since food inventory and fixtures rarely have substantial residual liquidation value. The analysis should not focus on whether the counterparty is "assured of repayment" or depends "on a merchant's success," but instead on whether the counterparty's right to recovery is limited to a specific *res* of purchased assets. When the counterparty has a *legal right* to be paid in full by the business, the existence of that legal right would be indicative of a debtor-creditor relationship even if *practical realization of that legal right* is "contingent on a merchant's success" and hence not assured.

**MEMORANDUM OPINION**             Page 20

some extent.  These include the absence of any provisions allowing the Shoot the Moon entities to repurchase the receivables as contemplated in factor five or permitting CapCall to alter the pricing terms as contemplated in factor six.  It would be the rare case, though, when every factor points in the same direction.  The applicable legal test requires a holistic approach keyed to specific facts and a weighing of factors.  Here, the court has taken this approach and, after fully considering all the evidentiary support in CapCall's favor, concludes that it is comparatively insignificant and insufficient to overcome the determination the court reached above.

### Montana Usury Claim

Now that the transactions are properly classified, the court can proceed to the Trustee's claim that the economic terms of certain loans expose CapCall to a usury penalty under Montana law.  The Trustee limits this claim to the eleven transactions involving a Shoot the Moon LLC formed under Montana law.  CapCall, in opposition, addresses little of the substance but strongly disputes that Montana law applies and urges application of New York law.  Since New York lacks a usury statute analogous to Montana's, adopting the law of either state has drastic implications on the outcome of the Trustee's claim.  As such, the court must resolve the choice-of-law question.

I.    Choice of Law Analysis

In federal cases predicated on bankruptcy jurisdiction, courts in the Ninth Circuit apply the "federal" choice-of-law rules based on the Restatement (Second) of Conflict of Laws.[66]

Restatement section 187(2) sets forth a general rule for disputes involving contracts with two exceptions:

---

[66] *See, e.g.*, *First Cmty. Bank v. Gaughan (In re Miller)*, 853 F.3d 508, 515-16 (9th Cir. 2017).  This approach is not used everywhere.  *See PNC Bank v. Sterba (In re Sterba)*, 852 F.3d 1175, 1177 & 1177 n.1 (9th Cir. 2017) (noting that "[w]hen it comes to conflicts of law, bankruptcy is a bit of an odd duck" and highlighting a circuit split regarding which choice-of-law rules should apply).

The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or

> (b) application of the law of the chosen state would be [1] contrary to a fundamental policy of a state which [2] has a materially greater interest than the chosen state in the determination of the particular issue and [3] which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.[67]

The Restatement commentary explains that contract law generally operates "to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract," but this predictability value is overcome when a fundamental policy of a state that would otherwise provide the applicable law is in play since judicial "regard must also be had for state interests and for state regulation."[68]

Before applying this framework, the court must consider the scope of its application. Broadly, CapCall urges the court to construe the arrangements as part of a single larger agreement rather than several discrete agreements. Based on this construction, CapCall recasts its relationship with the Shoot the Moon entities as one involving a "multistate transaction" since CapCall also transacted with entities formed and operating in Idaho and Washington. CapCall insists that this construction is most faithful to the predictability rules endorsed by the Restatement.[69] CapCall's position is flawed.

---

[67] RESTATEMENT (SECOND) OF CONFLICT OF LAWS (Am. Law Inst. 1971) ("RESTATEMENT") § 187(2).

[68] *Id.* § 187 cmts. e, g.

[69] *See, e.g., id.* § 187 cmt. e. ("Prime objectives of contract law are to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract. These objectives may best be attained in multistate transactions by letting the parties choose the law to govern the validity of the contract and the rights created thereby."); § 188 cmt. b. (highlighting "the fact that in multistate cases it is essential that the rules of decision promote mutually harmonious and beneficial relationships in the interdependent community, federal or international").

CapCall's argument is predicated on an inaccurate characterization of the arrangements – there was not one multistate transaction *among* all parties, but a series of eighteen separately documented, standalone transactions *between* CapCall and each applicable Shoot the Moon entity.[70]  CapCall asserts that the court can disregard the separateness of the eighteen transactions for two reasons.  First, CapCall suggests the Shoot the Moon entities should not be treated as distinct legal persons.  The record, however, provides no evidence to justify disregarding the foundational boundaries separating entities.  Although Mr. Hatzenbeller used a consolidated account to move money throughout the enterprise, he documented the flow of funds as intercompany loans.  Further, there is no evidence of hopeless entanglement among the entities or of any creditor confusion.[71]  Second, CapCall argues that the individual transactions should be collapsed into a single integrated deal.  Again, the record does not support this theory.  Although there is some loose relationship among the transactions (particularly those refinancing others), the documents clearly set forth discrete, self-contained transactions with integration clauses that cut against the consideration of external factors as CapCall proposes.[72]  Any evidence suggesting stronger linkage lacks clarity and weight.[73]  Unfortunately for CapCall's current litigation position, it chose not to structure these transactions as part of a single, larger agreement.[74]  The court declines

---

[70]  Case law demonstrates that the choice-of-law analysis should be performed on a contract-by-contract basis when a dispute involves multiple contracts that are related but nevertheless separate.  *See, e.g., Barnes Grp, Inc. v. C & C Prods., Inc.*, 716 F.2d 1023, 1026-32 (4th Cir. 1983); *Discover Prop. & Cas. Ins. v. TETCO, Inc.*, 2014 U.S. Dist. LEXIS 20306, at *15-17 (D. Conn. Feb. 19, 2014); *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 862 (D. Md. 2013).

[71]  *Cf. Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 765-67 (9th Cir. 2000) (outlining factors that could support substantive consolidation of separate legal persons in bankruptcy).

[72]  *See, e.g.*, Trial Ex. 105 at p. 5 § 4.8.

[73]  For example, CapCall points to two letters Mr. Leak signed that reference a series of four transactions recurring every two weeks.  *See* Trial Exs. 140-141.  The purpose of these letters is unclear as they do not request any action by the putative recipients or explain the details of any intended "information purpose."  In any event, it is unclear whether these letters were actually sent to anyone, the letters are extrinsic to written agreements containing integration clauses, and the letters are facially inaccurate when describing the transactions as being "between your account holder, Ken Hatzenbeller, and CapCall."  Indeed, one of the letters appears nonsensical as it is addressed to "Stockman Bank Account Manager."  *See* Trial Ex. 141.  Mr. Hatzenbeller's unrebutted testimony is that the Shoot the Moon entities never had accounts at Stockman Bank.  It is difficult to draw much of consequence from these two documents and they are certainly not a sufficient basis on which to justify collapsing eighteen separately documented transactions.

[74]  There are many examples of transaction structures in which a single, backbone agreement is used to accommodate numerous individual transactions.  Some exemplars include: revolving lines of credit, debt issuances in which a base indenture is coupled with supplemental indentures for specific issuances, commercial leasing in multiple locations subject to a master lease and individual location leases, derivative transactions using an ISDA master agreement and individual trade confirmations, law firm engagements utilizing a master retention agreement and separate addenda for each individual matter, and film distribution agreements whereby a uniform distribution agreement is supplemented with the details for individual films.

**MEMORANDUM OPINION**          Page 23

CapCall's invitation to construe the agreements in such a manner now and applies the Restatement's framework on a contract-by-contract basis.

The eleven agreements at issue all provide that New York law applies.[75] Thus, this provision controls unless a Restatement section 187(2) exception applies.[76]  The first, under paragraph (a), does not.  CapCall is based and operates in New York, which creates the necessary relationship and some reasonable basis for the choice-of-law clause.  If Montana law is to apply, then, all three conjunctive factors found in paragraph (b) must favor application of that state's law.  The court concludes that each factor supports application of Montana law based on the following analysis.

***Factor one***:  Applying New York law is inimical to the fundamental policy animating Montana's usury law.  A "fundamental" policy is one reflected by a substantive rule, rather than a mere legal formality, such as "in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power."[77]  This is the very policy and purpose of Montana's usury statute.  As the Montana Supreme Court highlighted, "[u]sury statutes protect borrowers who lack real bargaining power against overreaching by creditors" and advance an important "public policy in favor of protecting the debtor."[78]  And, as mentioned, New York lacks an analogous statute.  Thus, applying that state's law would circumvent Montana's protections entirely.  As such, the first factor is satisfied.[79]

***Factor two***:  Montana has a materially greater interest in the determination of this particular issue than does New York.  The borrowers in these transactions were legal entities formed under and governed by Montana law, owned by individual Montana citizens, and operated by an individual Montana citizen

---

[75]  *See, e.g.*, Trial Ex. 105 at p. 5 § 4.5.

[76]  Although the court ultimately does not reach or decide this issue, the record contains evidence that could support a general invalidation of the New York choice-of-law provisions given the minimal bargaining leverage of Mr. Hatzenbeller and the "take-it-or-leave-it" basis on which the deals were offered to him.  *See* RESTATEMENT § 187 cmt. b, illus. 3.

[77]  *Id.* § 187 cmt. g.

[78]  *Scarr v. Boyer*, 250 Mont. 248, 252 (1991).

[79]  *See, e.g.*, *Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616, 624 (3d Cir. 2009) (determining "that Pennsylvania's interest in the dispute, particularly its antipathy to high interest rates such as the 300.01 percent interest charged in the contract at issue, represents such a fundamental policy that we must apply Pennsylvania law"); *Fleetwood Servs., LLC v. Complete Bus. Sols. Grp., Inc.*, 374 F. Supp. 3d 361, 372 (E.D. Pa. 2019) (concluding that Texas usury law constituted a fundamental public policy of that state when applying Restatement section 187(2)(b)).

working from a Montana office.  The only relevant link to New York is CapCall's place of business.  This superficial connection generates little to no stake for New York in the outcome here.  By contrast, among Montana's significant interests in regulating lending transactions involving its citizens is the harm to borrowers and collateral damage to other Montanans and the local economy when problematic transactions break bad.  The underlying bankruptcy case here illustrates these interests well.  As the evidence shows, the extremely high cost of the CapCall loans contributed to the Shoot the Moon entities' downward spiral.  In turn, the failure of the businesses resulted in, among other things, financial losses for numerous Montana citizens.[80]  As between the two states, Montana has a substantially greater interest in preventing lenders from circumventing its usury laws in transactions involving Montana borrowers.[81] Because of this materially greater interest, the second factor is satisfied.

*Factor three*:  Under Restatement section 188, Montana law would control in the absence of an effective choice of law.  Section 188(1) generally provides that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the" overarching choice-of-law principles in Restatement section 6.[82]  When applying those overarching principles, Restatement section 188(2) illustrates relevant contacts for consideration: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties."[83]  The "contacts are to be evaluated according

---

[80]  *See, e.g.*, Trial Ex. 152 (listing creditors that will receive significantly less than recovery in full, including various Montana business and governmental entities).  *Cf. Colorado v. W. Sky Fin., L.L.C.*, 845 F. Supp. 2d 1178, 1181 (D. Colo. 2011) (observing, in litigation about allegedly improper lending practices, how "[t]he impact of the allegedly excessive charges was felt in Colorado").

[81]  This point is highlighted later in the Restatement.  *See* RESTATEMENT § 188 cmt. c. ("So the state where a party to the contract is domiciled has an obvious interest in the application of its contract rule designed to protect that party against the unfair use of superior bargaining power."); *see also, e.g.*, *DJR Assocs., LLC v. Hammonds*, 241 F. Supp. 3d 1208, 1232 n.11 (N.D. Ala. 2017) ("[A]n operating principle the court must respect is that each state is entitled to determine its own policies, and no state may insist that its laws be applied within other states to the exclusion of the power of such other states to decide for themselves what is good policy for regulating economic relationships within their own borders."); *Ribbens Int'l, S.A. de C.V. v. Transp. Int'l Pool, Inc*., 47 F. Supp. 2d 1117, 1123 (C.D. Cal. 1999) (noting, during choice-of-law analysis, that "California, on the other hand, maintains a weighty and substantial interest in regulating commercial transactions that take place within its border").

[82]  RESTATEMENT § 188(1).

[83]  *Id.* § 188(2).

**MEMORANDUM OPINION**          Page 25

to their relative importance with respect to the particular issue."[84]  The commentary further instructs that "the interest of a state in having its contract rule applied in the determination of a particular issue will depend upon the purpose sought to be achieved by that rule and upon the relation of the state to the transaction and the parties."[85]  Finally, the section 188(2) "factors are not to be applied mechanistically but qualitatively (based on the nature of the contract) in deciding which state has the most significant relationship to the parties and the contract."[86]

A holistic and qualitative evaluation of the relevant contacts in this proceeding demonstrates that Montana has the most significant relationship to the transactions and parties.  Specifically:

- Though negotiations occurred via telephone and internet, the signatures necessary to make the documents binding always physically occurred in Montana.[87]  No corresponding act occurred in New York.

- Montana was also the hub of performance.  CapCall processed the agreed upon funding to fulfill its role while the Shoot the Moon entities fulfilled their primary role by repaying the "Specified Daily Amount."  As Mr. Leak encouraged as CapCall's representative, both sides channeled the monetary performance through a Montana entity (Shoot the Moon Grizzly) using its account at a Montana bank (Prairie Mountain Bank).[88]  Other than repayment, the agreements required the Shoot the Moon entities to comply with various negative covenants and other restrictions.  These restrictions constrained how Mr. Hatzenbeller could operate the restaurants located in Montana from his Great Falls office.

- The subject matter of the agreements is also largely concentrated in Montana.  The cash advances were intended to fund Montana entities, operating restaurants in Montana, managed solely by a Montana resident,

---

[84]  *Id.*

[85]  *Id.* cmt. c.

[86]  *Bixler v. Next Fin. Grp., Inc.*, 858 F. Supp. 2d 1136, 1143 (D. Mont. 2012).

[87]  RESTATEMENT § 188 cmt. e. (explaining that "the place of contracting is the place where occurred the last act necessary . . . to give the contract binding effect" and that the place of negotiation "is of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone").

[88]  *See, e.g.*, Trial Ex. 130.

**MEMORANDUM OPINION**          Page 26

from an office located in Montana, and utilizing accounts at a Montana bank. The ineluctable connection to Montana is evident on the face of each Merchant Agreement CapCall prepared as well as the UCC-1 financing statements CapCall filed with the Montana Secretary of State.[89]

- Finally, aside from CapCall, all players domiciled, resided, incorporated, and operated in Montana. CapCall is a Delaware LLC with a principal place of business in New York. The relevant Shoot the Moon entities all organized and conducted business in Montana – the same locale where Mr. Hatzenbeller resided and operated the businesses. Likewise, the personal guarantors and signatories of confessions of judgment all resided in Montana.

Montana's contacts permeate every aspect of the relevant agreements while any contacts attributable elsewhere, including New York, are de minimis. As such, the court concludes that Montana has, by a wide margin, the most significant relationship to the transactions and parties as contemplated by Restatement section 188(1). This conclusion satisfies the third factor of section 187(2)(b). Since all three criteria are satisfied, Montana law applies to the Trustee's claim concerning the eleven agreements with Montana entities.[90]

## II.   Application of Montana Law

Montana enacted statutes limiting the interest lenders (other than "regulated lenders") may charge.[91] Accordingly, contracting "[p]arties may agree in writing to the payment of any rate of interest that does not exceed the greater of 15% or an amount that is 6 percentage points per year above the prime rate published by the federal reserve system in its statistical release H.15 Selected Interest Rates for bank

---

[89]   *See* Trial Exs. 102 at p. 1, 103 at p. 1, 104 at p. 1, 106 at p. 1, 109 at p. 1, 110 at p. 1, 111 at p. 1, 113 at p. 1, 115 at p. 1 (note that this agreement erroneously identifies the particular Shoot the Moon entity as being organized in Idaho despite CapCall contracting with that entity and correctly identifying it as a Montana entity twice before, *see* Trial Exs. 103, 104), 116 at p. 1, 118 at p. 1, 204, 205, 209, 210, 211.

[90]   *Cf. Casarotto v. Lombardi*, 268 Mont. 369, 373-75 (1994) (applying Restatement sections 187(2)(b) and 188 and concluding that Montana law applied to franchise dispute when franchisee restaurant would be operated in Great Falls by Great Falls residents and the primary connection to a different state was that the franchisor "was incorporated in that state and apparently had its home office in that state at the time of the parties' agreement"), *rev'd on other grounds sub nom. Doctor's Assocs. Inc. v. Casarotto*, 517 U.S. 681 (1995).

[91]   *See* Mont. Code Ann. § 31-1-111 (defining "regulated lender"). CapCall does not contend it qualifies as a "regulated lender" and the record contains no evidence supporting such qualification.

**MEMORANDUM OPINION**          Page 27

prime loans dated 3 business days prior to the execution of the agreement."[92]  Here, there appears to be no dispute that the greater of the two amounts is 15%.

When a lender has taken, received, reserved, or charged interest greater than legally permitted, the statutory penalty is "forfeiture of a sum double the amount of interest" charged and an express remedy for the borrower or its successor to recover "a sum double the amount of interest paid."[93]  The lender "need not know that the particular interest rate is usurious and illegal" but merely needs to consummate a transaction charging an interest rate that is usurious in fact.[94] "[B]efore any suit may be brought to recover the usurious interest, the party bringing suit" must make "written demand for return of the interest paid."[95]

The Trustee made the required written demand in relation to the eleven loans here.[96]  The Trustee's expert witness, Ms. Manos, performed a detailed analysis of the relevant transactions to calculate (i) the effective rate of interest CapCall charged and (ii) the applicable usury penalty under Montana law.[97]  CapCall did not challenge the details of the calculations or introduce evidence or analysis supporting alternative amounts.  Based on the lack of objection, Ms. Manos' credibility, and an independent review of her analysis, the court finds that the calculations appropriately quantify the interest rates applicable to the specified transactions and the resulting penalty.[98]  Additionally, based on the parties' relative sophistication and the overall context of the transactions, specifically CapCall's vast experience transacting with merchants and its exclusive control over the legal documentation, the court concludes that there is no equitable consideration

---

[92]  *Id.* § 31-1-107(1).

[93]  *See id.* § 31-1-108(1), (2).

[94]  *Scarr*, 250 Mont. at 253.  *See also Bowden v. Gabel*, 105 Mont. 477, 477 (1937).

[95]  Mont. Code Ann. § 31-1-108(2).

[96]  *See* Trial Ex. 146.

[97]  *See* Trial Ex. 145.  Although CapCall did not make any argument regarding the special usury rule in Restatement section 203, the court notes that the effective interest rates Ms. Manos calculated (between 82.7% at the low end and 175.13% at the high end) are many multiples of the permissible 15% and therefore are "greatly in excess of the rate permitted by the general usury law of the state of the otherwise applicable law under the rule of § 188." RESTATEMENT § 203.

[98]  Ms. Manos' approach to calculating the applicable interest rates squares with the broad statutory definition of interest as any "compensation allowed by law or fixed by the parties for the use or forbearance or detention of money and includes loan origination fees, points, and prepaid finance charges, as defined in 12 CFR 226.2." Mont. Code Ann. § 31-1-104.  *See also, e.g.*, *Brummer v. TMG Life Ins. Co. (In re Brummer)*, 147 B.R. 552, 558-59 (Bankr. D. Mont. 1992) (discussing how amounts are treated as interest under this statute "[r]egardless of the label used" if "the substance of the transaction" is to compensate the lender for an advance of money).

weighing against enforcing the full penalty.[99]  To the contrary, straightforward application of Montana law advances the statutory purpose of "protect[ing] borrowers who lack real bargaining power against overreaching by creditors."[100]  Thus, the court imposes the statutory penalty in its entirety.

III.  Judgment

Based on the above analysis, the Trustee is entitled to judgment on his usury claim against CapCall in the amount of $1,216,685.

**Preference Claim**

According to the Trustee's second claim, CapCall received funds within the 90 days immediately preceding the petition date on account of its loans to the Shoot the Moon entities.  The Trustee asserts these transfers are avoidable and recoverable pursuant to Bankruptcy Code sections 547 and 550.  Preference actions under the Bankruptcy Code are intended to deter the proverbial "race to courthouse" or other collection activity against an insolvent debtor and to further the prime bankruptcy policy of equality of distribution among similarly situated creditors.[101]  Indeed, the authority "to avoid preferential transfers and to recover the transferred property . . . has been a core aspect of the administration of bankrupt estates since at least the 18th century."[102]

I.  Statutory Preference Elements

To prevail on his preference claim, the Trustee has the burden of proving, by a preponderance of the evidence,[103] the following seven elements:[104]

---

[99]  *Cf. In re Dale*, 2021 Bankr. LEXIS 348, at *8-10 (Bankr. D. Mont. Feb. 12, 2021) (reducing usury penalty based on equitable considerations including the document drafting history and the parties' relative business experience).

[100]  *Scarr*, 250 Mont. at 252.

[101]  *See, e.g.*, *Union Bank v. Wolas*, 502 U.S. 151, 160-61 (1991).

[102]  *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 372 (2006).

[103]  *See, e.g.*, 11 U.S.C. § 547(g); *Batlan v. TransAm. Com. Fin. Corp. (In re Smith's Home Furnishings, Inc.)*, 265 F.3d 959, 967 (9th Cir. 2001).

[104]  The Small Business Reorganization Act of 2019 amended section 547(b) to require "reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c)" as part of a trustee's prima facie case.  The legislation was not effective until after the relevant time period here and was not retroactive regarding pending preference claims.

**MEMORANDUM OPINION**         Page 29

(1) a transfer

(2) of the debtor's property

(3) to or for the benefit of a creditor

(4) for or on account of an antecedent debt

(5) made while the debtor was insolvent

(6) within 90 days of the filing of the petition in bankruptcy

(7) that enables the creditor to receive more than he would under a Chapter 7 liquidation.[105]

Based on the totality of the record established at trial, the court determines that the Trustee has sustained this burden and, therefore, is entitled to avoid and recover the challenged transfers from CapCall, subject to one caveat discussed below. Following the elements above in turn, the record demonstrates that:

**First**, transfers in the aggregate of $1,129,071.00 were made to or for the benefit of CapCall.[106]  CapCall has offered no evidence or allegation otherwise.

**Second**, the $1,129,071 transferred was the debtor's property.  While CapCall does not dispute that the funds belonged to the various Shoot the Moon entities upon transfer, it does dispute that these funds belonged to the debtor.  The argument is that the several entities merged on the eve of bankruptcy to form a single entity that became the debtor, hence the funds could not have belonged to the "debtor" because it did not exist at the relevant date.  Bankruptcy Judge Terry L. Myers rejected an identical argument made in one of the several related adversary proceedings.[107]  The court agrees with and adopts Judge Myers' analysis regarding the issue.[108]  The rationale is consistent with precedent giving a broad

---

[105]  *United States v. Daniel (In re R & T Roofing Structures & Com. Framing)*, 887 F.2d 981, 984 (9th Cir. 1989).

[106]  *See* Trial Ex. 144.  Ms. Manos testified that she prepared this document after evaluating the underlying bank statements.  *See* Trial Exs. 158-160.

[107]  *See Foster v. IOU Cent., Inc. (In re Shoot the Moon, LLC)*, 2020 Bankr. LEXIS 1374, at *13-16, *26-29 (Bankr. D. Mont. May 21, 2020).

[108]  The court has a different perspective regarding another aspect of Judge Myers' opinion, which deals with an argument that CapCall generally deploys based on anti-assignment provisions in the Merchant Agreements.

**MEMORANDUM OPINION**                    Page 30

construction to the scope of property in the bankruptcy context.[109]  Moreover, "'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."[110]  In short, if the funds were not transferred to CapCall, they would have remained property of the Shoot the Moon entities before the merger, then property of the merged entity, and finally property of the estate.  These transfers ultimately diminished the Shoot the Moon bankruptcy estate, which means they were transfers of the debtor's property for purposes of Bankruptcy Code section 547.[111]

*Third*, the $1,129,071 in transfers were to or for the benefit of CapCall in its capacity as a "creditor."[112]

*Fourth*, the transferred funds were used to satisfy the prepetition loan obligations already discussed.  Thus, the transfers were for or on account of an antecedent debt.[113]

---

*See, e.g.*, Trial Ex. 105 at p. 5 § 4.2 (precluding the Shoot the Moon entity "from transferring or assigning this Agreement, or any of its rights or obligations hereunder, without [CapCall]'s written consent"). Judge Myers concluded that "rights are generally assignable unless the contract provides otherwise or an exception applies" and "the right to avoid a preferential transfer or challenge allegedly usurious interest rates does not fall into the enumerated exceptions." *See* 2020 Bankr. LEXIS 1374, at *12.  The right to avoid a preference, however, was never one the debtor enjoyed – preference actions are creatures of the Bankruptcy Code that exist only postpetition for the benefit of the estate, not the debtor, and hence are unaffected by prepetition acts of the debtor.  *See, e.g., Cont'l Ins. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 671 F.3d 1011, 1026 (9th Cir. 2012) (explaining how "purported prepetition waivers of the protections of the Bankruptcy Code" are generally unenforceable); *Bakst v. Bank Leumi, USA (In re D.I.T., Inc.)*, 575 B.R. 534, 536 (Bankr. S.D. Fla. 2017) (describing how various nonbankruptcy defenses, such as *in pari delicto*, "may not be raised in response to an action brought by the estate representative under the provisions of the Bankruptcy Code itself, including fraudulent transfer and preference actions").  Additionally, neither a preference claim nor a Montana usury claim is a right arising under or pursuant to the Merchant Agreements.  Rather, both rights are the product of statutory regimes that exist apart from the agreements.  Because the Trustee is not seeking to assert any of the Shoot the Moon entities' "rights or obligations hereunder," the anti-assignment provisions in the Merchant Agreements are irrelevant to the preference and usury claims.

[109]  *See, e.g., United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983).

[110]  *Begier v. IRS*, 496 U.S. 53, 58 (1990).  *See also, e.g., United States v. Sims (In re Feiler)*, 218 F.3d 948, 953 (9th Cir. 2000) (explaining that avoidance actions allow "a trustee to avoid transfers of property that *should have been* the property of the estate, but for an improper transfer"); *Mardick v. Stover*, 392 F.2d 561, 565 (9th Cir. 1968) (discussing how "the concept of voidable preference" is intended to capture "property of any bankrupt which would, but for transfer, have constituted part of his estate").

[111]  *See, e.g., Adams v. Anderson (In re Superior Stamp & Coin Co.)*, 223 F.3d 1004, 1007 (9th Cir. 2000).

[112]  *See* 11 U.S.C. § 101(5)(A), (10)(A) (defining the terms "claim" and "creditor").

[113]  *See id.* § 101(12) (defining the term "debt").

**MEMORANDUM OPINION**          Page 31

***Fifth***, the transfers were made while the Shoot the Moon entities were insolvent.  As an initial matter, the Trustee enjoys a presumption of insolvency[114] and CapCall introduced no evidence or argument to rebut the presumption.  Aside from this, the Trustee presented evidence of insolvency.  Ms. Manos testified that the entities were insolvent, both individually and collectively, and she offered documents showing the work she used to arrive at this conclusion.[115]  Mr. Hatzenbeller also testified that the Shoot the Moon enterprise had effectively become trapped in a death spiral by no later than the summer of 2015.

***Sixth***, all the challenged transfers were made within 90 days of the petition date.  The bankruptcy case was filed on October 21, 2015, and Ms. Manos' calculations are specifically limited to payments within the previous 90 days.[116]

***Seventh***, the transfers enabled CapCall to receive more than it would have in a chapter 7 liquidation.  This final inquiry is "sometimes referred to as the 'greater amount' test [and] requires the court to construct a hypothetical chapter 7 case and determine what the creditor would have received if the case had proceeded under chapter 7."[117]  In this case, the scenario is something less than hypothetical because the Trustee actually liquidated most of the bankruptcy estate property in the same manner a hypothetical chapter 7 trustee would proceed.  Nevertheless, the court will embark on the complete exercise.

In a hypothetical chapter 7 case, the funds transferred to CapCall would have instead become property of the chapter 7 estate subject to the security interests of CapCall that are junior to other security interests in the same assets.  A chapter 7 trustee might seek to use this cash collateral to operate the restaurants for a limited period to preserve assets.[118]  The chapter 7 trustee then would try to do what the Trustee actually did here – reduce the business assets to cash via a section 363 sale.[119]  The hypothetical sale could not have obtained a greater net purchase price than the Trustee's actual sale and likely would have obtained less.  The chapter 7 trustee thus would be left with, at best, the same sale proceeds and the cash that counterfactually was not transferred to CapCall.  As with the present case, this

---

[114]   *See id.* § 547(f).

[115]   *See* Trial Ex. 157.

[116]   *See* Trial Ex. 144.

[117]   *Alvarado v. Walsh (In re LCO Enters.)*, 12 F.3d 938, 941 (9th Cir. 1993).

[118]   *See* 11 U.S.C. § 721.

[119]   *See id.* § 704(a)(1).

**MEMORANDUM OPINION**                    Page 32

amount would be insufficient to satisfy secured claims senior to CapCall.[120] CapCall therefore would have only a general unsecured claim,[121] which would generate a limited, if any, distribution from the chapter 7 estate. As Ms. Manos testified at trial, then, the prepetition transfers to CapCall enabled CapCall to recover significantly more than CapCall would have received in a hypothetical chapter 7 liquidation and the "greater amount" test is satisfied.[122]

In its post-trial submission, CapCall offers the following arguments regarding the "greater amount" test:

> CapCall's claims in a hypothetical Chapter 7 would have resulted in an enforceable lien both at the time of filing said petition for Chapter 7 protection as well as during the pendency of the case administration. Specifically, CapCall would have had a lien on the debtor's accounts at the time of filing. The extent to which there were other creditors that similarly had liens does not affect the extent to which the lien would be legally enforceable. Further, the primary asset secured by CapCall's lien would be not just the accounts of the debtor but the *future* receivables as well and their proceeds as liquidated.[123]

These points ignore fundamentals of the Bankruptcy Code. The "extent to which there were other creditors that similarly had liens" on the same collateral certainly ***does*** "affect the extent to which the lien would be legally enforceable" under Bankruptcy Code section 506. This section limits a secured claim "to the extent of the value of such creditor's interest in the estate's interest in such property" and bifurcates the remainder as "an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim."[124] Thus, if liens senior to CapCall's exceed the value of the collateral, then CapCall is left with an unsecured claim (because the value of its junior, out-of-the-money interest

---

[120]   *See* Trial Ex. 152 (column for claims that were "Secured Converted to Unsecured after Sale Closure," which include deficiency claim amounts significantly in excess of the aggregate amount of the CapCall transfers).

[121]   *See* 11 U.S.C. § 506(a).

[122]   *See, e.g., Am. Honda Fin. Corp. v. A. Angelle, Inc. (In re A. Angelle, Inc.)*, 230 B.R. 287, 300 (Bankr. W.D. La. 1998) (concluding that greater amount test was satisfied when the transferee "did not enjoy a senior secured position with respect to [the collateral], nor to the proceeds resulting from the sale thereof, and, accordingly, was not fully secured with respect to that transfer").

[123]   Suppl. Post Trial Br. 8, ECF No. 275.

[124]   11 U.S.C. § 506(a).

**MEMORANDUM OPINION**          Page 33

is $0) and no enforceable lien.[125]  Further, CapCall's security interest regarding future receivables not existing on the petition date terminates under Bankruptcy Code section 552 insofar as those future receivables are "property acquired by the estate or by the debtor after the commencement of the case" but not "proceeds, products, offspring, or profits" of property in which CapCall had a security interest and which was extant on the petition date.[126]  And, even absent section 552, CapCall's lien would still be junior to senior, but undersecured, lienholders and CapCall would be back where it started: with an unsecured claim and an unenforceable lien.  Despite CapCall's efforts, it cannot spoil the Bankruptcy Code fruits growing from the seed of senior-yet-undersecured liens on the collateral granted to secure the Shoot the Moon entities' obligations to CapCall.[127]

## II.   Recovery Limitations

Although the Trustee prevails on the preference claim under Bankruptcy Code section 547(b), he is "entitled to only a single satisfaction" in an avoidance action.[128]  Consistent with this mandate, the court should eliminate any overlap between recovery on the claim here and recovery on the usury claim above.[129]  Some preferential transfers include interest CapCall must return because of the judgment on the usury claim.  The Trustee could obtain more than a single recovery if CapCall is required to return the same money to satisfy each judgment separately.  Therefore, the Trustee is entitled to a judgment in the full amount of the preferential transfers subject to a reduction on a dollar-for-dollar basis equal to any imputed interest included within the preferential payments, but only to the

---

[125]  *See id.* § 506(d).

[126]  *See id.* § 552(a)-(b)(1); *see also, e.g., Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Designated Activity Co. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 948 F.3d 457, 466-72 (1st Cir.), *cert. denied*, 141 S. Ct. 844 (2020); *Sims v. Jamison*, 67 F.2d 409, 411 (9th Cir. 1933).

[127]  It bears noting that CapCall could have avoided the position in which it now finds itself.  Mr. Marmott testified that he is familiar with the operation of UCC-1 financing statements and that it is standard practice in the industry for merchant cash advance parties to file such financing statements.  If it is not industry practice to perform a precautionary search for other financing statements before making a cash advance, it certainly should be.  Had CapCall performed such a search, CapCall likely would have realized that there were preexisting lenders with first-in-time financing statements encumbering all assets of the relevant Shoot the Moon entities, including their accounts receivable, which may have deterred CapCall from engaging in the transactions.

[128]  11 U.S.C. § 550(d).

[129]  *See, e.g., Samson v. W. Cap. Partners, LLC (In re Blixseth)*, 489 B.R. 154, 202 (Bankr. D. Mont. 2013) (describing similar issue when there was an overlap between amounts recoverable based on fraudulent transfer theory and amounts recoverable under the Montana usury statute), *aff'd*, 514 B.R. 871 (D. Mont. 2014), *aff'd in part, rev'd in part*, 679 F. App'x 611 (9th Cir. 2017) (the basis for reversal related to a totally separate issue).

**MEMORANDUM OPINION**         Page 34

extent CapCall actually satisfies in full its liability to the Trustee under the Montana usury statute.

## III.  Judgment

Subject to the judgment-reduction provision above, the Trustee is entitled to avoidance and recovery of preferential transfers totaling $1,129,071.

## *Other Issues*

The parties raise a handful of other claims and issues requiring attention.

## I.  CapCall's Claims

After the petition date, credit card payments continued to be processed from business operations.  CapCall asserts ownership of the funds based on its purported purchase of the receivables.  The Trustee received and utilized a portion of those funds, and the balance is held in the segregated account mentioned previously. CapCall seeks (i) a monetary judgment against the Trustee for conversion of the portion of the funds the Trustee received and (ii) a declaratory judgment that the remaining balance held in the segregated account belongs to CapCall.  The court effectively disposed of these claims upon determining that CapCall did not purchase the receivables but extended loans collateralized by the assets – loans that are ultimately unsecured for the reasons described above.[130]  Because CapCall

---

[130]   In its post-trial submission, CapCall contends that "there are no claims either pleaded or proofs offered toward claims of lien stripping under 11 U.S.C. § 506(d)."  Suppl. Post Trial Br. 7, ECF No. 275.  Regarding the former point, CapCall is correct that the Trustee did not plead a formal count under Bankruptcy Code section 506(d).  It is unclear that such formal pleading is necessary, however; section 506(d) by its terms is self-operative when it declares that that a lien falling within its scope "is void" as opposed to being potentially "voidable" through litigation.  *Compare* 11 U.S.C. § 506(d), *with, e.g., id.* §§ 544(a)-(b)(1), 545, 547(b), 548(a)-(c), 549(a); *see also, e.g., id.* § 551 (clearly differentiating between a transfer that "is avoided" under various sections and "any lien void under section 506(d)"); *Bank of N.Y. Mellon v. Enchantment at Sunset Bay Condo. Ass'n*, 2 F.4th 1229, 1235-37 (9th Cir. 2021) (VanDyke, J., concurring) (tracing historical distinction between the separate concepts of "void" and "voidable" in the context of the automatic stay; noting that "[i]f a transaction is void, it is null—it is as if it never existed").  In any event, the Trustee's position throughout this litigation has been that CapCall's potential collateral is unencumbered property of the estate, which necessarily challenges any lien that CapCall asserts.  *See, e.g.,* Def.'s Countercl. 11 ¶ 45, ECF No. 17; Final Pretrial Order 8-9, 24, ECF No. 260.  Regarding the latter point, CapCall is incorrect that there were no "proofs offered" in support of lien-stripping – the Trustee introduced clear evidence, which CapCall failed to rebut, demonstrating the existence of senior liens on all of CapCall's collateral and that those senior liens are undersecured, which is all the proof necessary to leave CapCall with no allowable secured claim under Bankruptcy Code section 506(a) and hence only void liens under section 506(d).

lacks an ownership or enforceable security interest in the receivables, these claims are nonstarters and the Trustee is entitled to the remaining segregated account.[131]

## II.    CapCall's General Unsecured Claim: Allowance & Subordination

Because CapCall is obligated to the bankruptcy estate on the preference claim, CapCall is not entitled to payment on its proof of claim until it has satisfied the judgment set forth herein.[132]  Thus, CapCall's claim is presently disallowed.  CapCall may file an amended proof of claim, within 30 days after satisfying the judgment related to the preference claim, detailing any additional amounts that CapCall asserts under Bankruptcy Code section 502(h).  The Trustee must object within 60 days or CapCall's amended proof of claim will constitute CapCall's allowed general unsecured claim for all purposes in the bankruptcy case.[133]

## III.    Attorneys' Fees and Costs

The Trustee asserts a right to an award of attorneys' fees against CapCall pursuant to Montana's reciprocal fee statute, which makes unilateral fee provisions bilateral regarding "any action on the contract" and entitles the prevailing party in

---

[131]  Adding to these considerations, CapCall is also bound by the terms of the confirmed plan providing that "[a]ny creditor with a lien that no longer has any value will become a general unsecured creditor." *See In re Shoot the Moon, LLC*, No. 2:15-bk-60979-WLH (Bankr. D. Mont.), Plan of Liquidation § 3.9, ECF No. 1056; *see also id.* § 1.0 (advising parties to carefully review the disclosure statement and evaluate "the impact of the plan upon your claims or security interests" (all-caps font removed)).  CapCall received notice of the plan and had participated in the Shoot the Moon bankruptcy (including through the stipulation regarding the segregated funds and by filing a proof of claim) and thus CapCall is bound by the plan as well as by Bankruptcy Code section 1141(c)'s generalized free-and-clear provision. *See* 11 U.S.C. § 1141(c) (providing that, subject to certain inapplicable exceptions, "except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor").  The segregated account is "dealt with" in section 2.15 of the confirmed plan, which transfers "all remaining assets of the Estate" to the STM Liquidating Trust. *See also* Trial Ex. 155 § 2.2.  Given the terms of the confirmed plan and CapCall's participation in the bankruptcy case, this is not a context where the "ride through" doctrine has any application. *See, e.g., Acceptance Loan Co. v. S. White Transp., Inc. (In re S. White Transp., Inc.)*, 725 F.3d 494, 496 (5th Cir. 2013); *In re Penrod*, 50 F.3d 459, 461-64 (7th Cir. 1995).  The unpublished case CapCall cites regarding the "ride through" doctrine is distinguishable because that litigation arose from a chapter 7 case in which there was no plan and no role for section 1141(c). *See Nagata v. HFS Fed. Credit Union (In re Nagata)*, 2006 Bankr. LEXIS 1634, at *2, *6-7 (Bankr. D. Haw. July 20, 2006).

[132]  *See* 11 U.S.C. § 502(d).

[133]  The Trustee argued in post-trial briefing that the court should equitably subordinate all of CapCall's claims pursuant to Bankruptcy Code section 510(c). *See* Trustee's Post-Trial Br. 13-16, ECF No. 274.  The court need not reach the details of this theory because counsel withdrew the new claim during closing argument and acknowledged that the issue was not raised before trial. *See, e.g., Greenstar, LLC v. Heller*, 934 F. Supp. 2d 672, 696 (D. Del. 2013).

**MEMORANDUM OPINION**          Page 36

such an action "to recover reasonable attorney fees from the losing party."[134]  The eleven agreements subject to Montana law each create an express right for CapCall to recover court costs and attorneys' fees associated with CapCall's enforcement of its broadly-defined rights and remedies.[135]  Thus, the court must assess whether these proceedings involve an action "on the contract."[136]

### i.    This Litigation Arises From the Merchant Agreements

In answering such questions, Montana courts apply the concept broadly and award reciprocal fees in varied contexts even when a contract is successfully attacked.[137]  This broad approach is consistent with decisions of the Ninth Circuit Court of Appeals applying similar reciprocal fee statutes of other states and concluding that actions are "on a contract" when the litigation generally "involves" that contract or a party's efforts "to enforce, or avoid enforcement of, the provisions of the contract."[138]  That the litigation arises in a bankruptcy context, involves some bankruptcy issues, or perhaps is even largely premised on a dispute about the Bankruptcy Code's operation does not affect whether an action is on the contract.[139]  Rather, the focus should be on the role and import of the contract in the litigation as well as whether the losing party "*could have* sought fees under the contract" had it prevailed.[140]

---

[134]   Mont. Code Ann. § 28-3-704(1).  As with the Montana usury statute, the policy purposes served by Montana's reciprocal fee statute are expansive and grounded in protecting parties with inferior bargaining power from contractual overreaching, which means the fee statute likewise represents a fundamental policy of the state for purposes of any choice-of-law analysis.  *See, e.g., Medcorp Int'l, L.L.C. v. Leslie*, 1998 U.S. App. LEXIS 21714, at *14 (9th Cir. Sept. 3, 1998).

[135]   *See* Trial Exs. 102 at p. 5 §§ 3.2-3.3, 103 at p. 5 §§ 3.2-3.3, 104 at p. 5 §§ 3.2-3.3, 106 at p. 5 §§ 3.2-3.3, 109 at p. 5 §§ 3.2-3.3, 110 at p. 5 §§ 3.2-3.3, 111 at p. 5 §§ 3.2-3.3, 113 at p. 5 §§ 3.2-3.3, 115 at p. 5 §§ 3.2-3.3, 116 at p. 5 §§ 3.2-3.3, 118 at p. 2 §§ 3.2-3.3.

[136]   This reciprocal right is one arising under Montana statute, not under the Merchant Agreements themselves.  As such, the anti-assignment provisions in the Merchant Agreements are not violated by their own terms and do not bear on the Trustee's ability to assert a claim to reciprocal attorneys' fees as successor to the applicable Shoot the Moon entities.  *See* note 108, *supra*.

[137]   *See, e.g., Gandy v. Eschler*, 261 Mont. 355, 360-61 (1993); *Carey v. Wallner*, 223 Mont. 260, 267 (1986); *Preston v. McDonnell*, 203 Mont. 64, 68 (1983); *Bartmess v. Bourassa*, 196 Mont. 231, 234 (1982); *see also generally Dickman v. Ford New Holland*, 1993 U.S. App. LEXIS 28731, at *6-7 (9th Cir. Oct. 25, 1993) (describing how "the Montana Supreme Court has construed" fee-shifting provisions such as section 28-3-704 "very liberally").

[138]   *Penrod v. AmeriCredit Fin. Servs. (In re Penrod)*, 802 F.3d 1084, 1088 (9th Cir. 2015).  *See also, e.g., Heritage Ford v. Baroff (In re Baroff)*, 105 F.3d 439, 442-43 (9th Cir. 1997).

[139]   *See In re Penrod*, 802 F.3d at 1088-89.

[140]   *See id.* at 1090.

**MEMORANDUM OPINION**          Page 37

The court concludes that the following aspects of this adversary proceeding constitute an "action on the contract" for purposes of Montana's fee-shifting statute:

- **True sales vs. disguised loans, conversion, and segregated funds**. The parties' dispute regarding these matters stems entirely from CapCall's efforts to enforce provisions of the Merchant Agreements based on its interpretation of those agreements. As the court's extensive earlier discussion demonstrates, resolution of the dispute requires significant review and interpretation of numerous aspects of the agreements and related documents.

- **Choice-of-law and usury disputes**. The genesis of both issues is again the Merchant Agreements. To reach the usury claim, the court needed to resolve two threshold questions: first, whether the transactions amounted to loans or sales and, second, whether New York or Montana law applies. Again, these issues cannot be resolved without closely considering the substance of the Merchant Agreements. Once resolved, the next step required the court to examine the payment obligations under the agreements to determine the imputed interest rates for the transactions, as Ms. Manos did during her expert testimony.

- **Preference claim**. As Bankruptcy Judge Charles Novack explained in the context of California's similar reciprocal fee statute, "[a] preference action is premised on an 'antecedent debt' (i.e. a contractual obligation) and payments being made on that debt (which payments the Trustee sought to avoid)."[141] As in Judge Novack's case, resolution of the preference claim here required consideration of the Merchant Agreements and related documents and, of course, determination whether CapCall was a creditor or a purchaser.

The broad fee provisions in sections 3.2 and 3.3 of the agreements would entitle CapCall to attorneys' fees upon prevailing in the adversary proceeding. CapCall has in fact sought such fees. Therefore, CapCall recognizes that this litigation arises from the Merchant Agreements and triggers their fee provisions.

---

[141]   *In re Mac-Go Corp.*, 541 B.R. 706, 715 (Bankr. N.D. Cal. 2015).

### ii.    Fee Award

An award of attorneys' fees under Montana Code section 28-3-704 must be "reasonable."  The determination of a reasonable fee amount is committed to the trial court's discretion.[142]  The Trustee argues that the court should key an award to the contingency-fee arrangement with his counsel and "award attorney's fees in the amount of 40% of the gross sum of any judgment entered in this matter."[143]  When fixing the amount of a reasonable fee, the trial court may consider but "is not bound [by] a contingent fee agreement."[144]  Rather, the overarching inquiry must incorporate the typical factors Montana courts use to determine a reasonable award.[145]

Here, many factors support a substantial award for the Trustee.  This litigation has been pending for four years and involved significant legal work, including discovery, several rounds of motion practice, a formal mediation and other settlement efforts, a multiday trial, and post-trial briefing and argument.  The amount of money at stake is substantial and the issues are largely binary, which creates a material risk of no recovery for the Trustee's counsel.  As this opinion evinces, the issues involved in this case are complicated and highly factual.[146]  Moreover, the litigation has been hard-fought by competent lawyers zealously advocating for CapCall (including, at one point, lawyers with a national practice based in New York, as well as several experienced and reputable Montana lawyers).  To the best of the court's knowledge, the Trustee counsel have a fine

---

[142]   *See, e.g.*, *Transaction Network v. Wellington Techs.*, 301 Mont. 212, 221 (2000); *Majers v. Shining Mountains*, 230 Mont. 373, 380 (1988).

[143]   Trustee's Post-Trial Br. 13, ECF No. 274.  Pursuant to Federal Rule of Evidence 201(c)(1) & (d), the court takes judicial notice of the fee agreement containing the 40% contingency amount, which was filed and approved in the underlying bankruptcy case.  *See In re Shoot the Moon, LLC*, No. 2:15-bk-60979-WLH (Bankr. D. Mont.), ECF Nos. 1052, 1072.

[144]   *Weinberg v. Farmers State Bank*, 231 Mont. 10, 34 (1988), *superseded by statute on other grounds*, Mont. Code Ann. § 27-1-220(1), *as recognized in Folsom v. Mont. Pub. Emps. Ass'n*, 388 Mont. 307 (2017).  *See also, e.g.*, *West v. Club at Spanish Peaks L.L.C.*, 343 Mont. 434, 460-62 (2008) (affirming use of 40% contingency fee arrangement to calculate reasonable fee for the prevailing party).

[145]   *See Weinberg*, 231 Mont. at 35 (quoting factors as "the amount and character of the services rendered; the labor, time, and trouble involved, the character and importance of litigation in which the services were rendered, the amount of money or the value of property to be affected, the professional skill and experience called for, the character and standing in the profession of the attorneys; . . . the result secured by the services of the attorneys may be considered as an important element in determining their value").

[146]   The complexity associated with this litigation is amplified somewhat by the assignment of three different bankruptcy judges to the Shoot the Moon bankruptcy case.  Whenever a new judge, such as the undersigned, takes over, there is additional work counsel must do to familiarize that judge with past events bearing on the litigation.  The Trustee's counsel has done a fine job here.

**MEMORANDUM OPINION**          Page 39

reputation for character and standing in the profession and the court has been impressed with the quality of their legal work, particularly the efficient and professional presentation of evidence and witness examination at trial.  Finally, the results secured by counsel's service are significant – this adversary proceeding yields a multi-million-dollar judgment and potential recovery for the benefit of the bankruptcy estate – and there may be additional work the Trustee's counsel must do in connection with any appeals or to enforce the judgment.

All that said, the court deems it excessive to require CapCall to pay an additional 40% of the entire gross judgment.  Some amounts reflect a penalty component (such as the usury claim).  Awarding a full contingency fee based on these penalties is simply inflating the judgment.[147]  Additionally, the nominal amount of the judgment to be entered regarding the preference claim will be reduced by a yet-to-be-determined amount if and when CapCall pays the full amount of the Montana usury penalty.  And some of the preferential transfers related to Merchant Agreements that did not involve Montana parties.  Thus, a downward adjustment is warranted.

After considering the totality of the circumstances and the specific factors courts utilize under Montana law, the court concludes that a reasonable fee under Montana Code section 28-3-704 is: **[a]** 30% of the balance of the segregated funds ($68,512.48), **[b]** 20% of the amount of the Montana usury penalty ($243,337), and **[c]** 10% of the amount of the avoided preferential transfers ($112,907.10), which results in a total fee award of $424,756.58.[148]

### iii.    Costs

The Trustee also seeks recovery of $2,159.75 in costs.  The plain text of Montana Code section 28-3-704 does not mention costs and imposes a reciprocal obligation only regarding attorneys' fees.[149]  The Trustee identifies no other basis for an award of costs and the court therefore denies the request.

---

[147]  For example, a 40% fee regarding the usury penalty would by itself equal 80% of the interest CapCall was paid in the first instance.

[148]  To be clear, this is the amount that the Trustee is entitled to include in a judgment against CapCall pursuant to Montana Code section 28-3-704.  The amount that the Trustee's counsel is entitled to receive for payment of their services is a separate matter governed by the terms of the operative agreement with the Trustee.

[149]  *See Masters Grp. Int'l, Inc. v. Comerica Bank*, 404 Mont. 434, 471 (2021).

**MEMORANDUM OPINION**                    Page 40

## SUMMATION

The Trustee is entitled to a judgment against CapCall consistent with this opinion.  The Trustee should submit a proposed form of final judgment and indicate whether CapCall agrees to or contests the proposed form.

DATED: September 10, 2021.

_____
WHITMAN L. HOLT
U.S. BANKRUPTCY JUDGE